(No. 83382.—

LEWIS E. *et al.*, Appellees, v. JOSEPH A. SPAGNOLO, Superintendent of Education, *et al.*, Appellants.

*Opinion filed April 15, 1999.*

FREEMAN, C.J., joined by HARRISON, J., concurring in part and dissenting in part.

James E. Ryan, Attorney General, of Springfield (Barbara A. Preiner, Solicitor General, and Rita M. Novak and Deborah L. Ahlstrand, Assistant Attorneys General, of Chicago, of counsel), for appellants Joseph A. Spagnolo & the Illinois State Board of Education.

Pearson C.J. Bush, of East St. Louis, for appellants East St. Louis School District No. 189 & Geraldine Jenkins.

Harold C. Hirshman, David E. Lieberman and Melanie S. Berkowitz, of Sonnenschein, Nath & Rosenthal, Susan Wishnick, Benjamin S. Wolf, Harvey Grossman and Adam Schwartz, all of Chicago, and Thomas E. Kennedy III, of Alton, for appellees.

JUSTICE BILANDIC delivered the opinion of the court:

In this appeal, this court is once again asked to enter the arena of Illinois public school policy. A class of schoolchildren residing in East St. Louis School District 189 challenges the adequacy of the education being provided to them in District 189 schools. We now reaffirm our recent holding in *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1 (1996), that questions relating to the quality of a public school education are for the legislature, not the courts, to decide.

The plaintiffs are a putative class of school-age children residing in East St. Louis School District 189 (the District), acting through their parents or guardians. The named plaintiffs are 11 children attending various elementary or secondary schools in the district. The defendants are the Illinois State Board of Education and Superintendent of Education Joseph Spagnolo (the State defendants), and the board of education of the East St. Louis School District 189 and Geraldine Jenkins, the superintendent of District 189 (the District defendants).

The plaintiffs filed their class action complaint in the circuit court of St. Clair County on April 12, 1995.

The complaint alleges the existence of numerous deficiencies in District 189 schools. The complaint charges that the District defendants have, for decades, failed to maintain school buildings and grounds in a manner that protects the safety of District students, failed to provide rudimentary instructional equipment and qualified teachers, and "otherwise so mismanaged the affairs of the District that children are unsafe and cannot reasonably be expected to learn in District schools."

The complaint alleges that "most" of the District's 31 school buildings are in "wretched disrepair." The plaintiffs cite numerous examples of unsafe conditions in the schools which, they contend, are the result of the District defendants' neglect, including: fire hazards; chronic flooding; structural flaws, such as falling plaster and cracked walls and roofs; malfunctioning heating systems; unsanitary restrooms; rooms sealed off due to the presence of asbestos; broken windows; burnt-out light bulbs; nonworking water fountains; the presence of cockroaches and rats; and cold, nonnutritious lunches in the cafeterias. These examples are alleged to have occurred in various schools at various times since 1989. The complaint further alleges that, due to the District defendants' failure to provide adequate security, violence in the schools is widespread. The complaint lists several examples of violence which have occurred in various schools.

The plaintiffs' complaint also charges that, because of the District defendants' neglect and mismanagement, the students in the District are provided with meager instructional equipment, unsupervised, disengaged, and uncertified teachers, and systemic staffing deficiencies which resulted in some classrooms being without teachers at times. The complaint also cites to high drop-out

rates and low test scores among the students in the District and alleges that these poor outcomes are the result of the District defendants' failure to provide an adequate instructional program. Finally, the complaint charges the District defendants with reckless mismanagement of the District's financial affairs.

As to the State defendants, the plaintiffs' complaint alleges that they have failed to adequately intervene in the District defendants' administration of the District. The plaintiffs acknowledge that the State Board of Education appointed a financial oversight panel in 1994 to oversee the District's finances. The complaint alleges that the panel's authority is too circumscribed to remedy problems of student safety and educational quality. The plaintiffs also allege that the State defendants have failed to enforce educational and safety standards in the District. Specifically, the complaint charges that the State defendants continue to formally recognize and otherwise accredit District schools that they know or should know are unreasonably dangerous and educationally inadequate.

The complaint charges that the State and District defendants have violated the plaintiffs' rights under the education article of the Illinois Constitution (Ill. Const. 1970, art. X, § 1), the due process clauses of the United States and Illinois Constitutions (U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 2), and various provisions of the Illinois School Code (105 ILCS 5/1—1 *et seq.* (West 1996)). In addition, the complaint alleges that the District defendants have violated common law duties owed to the plaintiffs.

The plaintiffs seek a declaratory judgment that they "have the right to a safe, adequate education under the Illinois and United States Constitutions, the School Code, and common law." The plaintiffs further seek an order requiring the defendants to submit and implement a plan

assuring the provision of safe, adequate public schools and correcting the conditions outlined in the complaint. In the alternative, the plaintiffs request that the State Board be ordered to revoke recognition of District 189 and to direct the reassignment of District 189 pupils to other school districts. The plaintiffs also seek an order directing the defendants to provide the plaintiffs with supplemental educational services needed to compensate them for the inadequate education provided to them in the past.

The circuit court dismissed the plaintiffs' complaint with prejudice, pursuant to section 2—615 of Code of Civil Procedure (735 ILCS 5/2—615 (West 1996)). The plaintiffs appealed and the appellate court reversed in part and affirmed in part. The appellate court affirmed the dismissal of each of the plaintiff's claims. 287 Ill. App. 3d 822. The appellate court, however, did so only on the ground that the plaintiffs had not pled sufficiently detailed facts stating the particular acts and omissions of the defendants that allegedly created the inadequate conditions in the schools. The court held that the plaintiffs could possibly plead facts sufficient to state a claim under each of these theories and remanded to allow the plaintiffs to amend their complaint.

We granted a petition for leave to appeal filed by the defendants. 166 Ill. 2d R. 315. The plaintiffs are seeking cross-relief from the appellate court's holdings that they did not plead sufficiently detailed facts to avoid the dismissal, albeit without prejudice, of their claims.

## ANALYSIS

### I. Education Article

We first address whether the plaintiffs may state a cause of action under the education article of our state constitution. Ill. Const. 1970, art. X, § 1. Section 1 of

article X of the Illinois Constitution of 1970 provides, in its entirety, as follows:

"A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities.

The State shall provide for an efficient system of high quality public educational institutions and services. Education in public schools through the secondary level shall be free. There may be such other free education as the General Assembly provides by law.

The State has the primary responsibility for financing the system of public education." Ill. Const. 1970, art. X, § 1.

The plaintiffs argue that this article grants them the right to a "minimally adequate education," and that they may sue state and local officials directly under this article for deprivation of that right. They claim that schoolchildren who are denied the "basic components" of education, which they define as "teachers, textbooks, and reasonably safe school buildings," are denied a free public education in violation of this article. The defendants respond that, under this court's decision in *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1 (1996), the quality of public education is a legislative matter and is not justiciable.

We agree with the defendants that *Committee for Educational Rights* is dispositive of this issue. In that case, a group of plaintiffs consisting of school districts, local boards of education, students and parents brought an action to challenge the state statutory scheme governing the funding of public schools in Illinois. Among other claims, the plaintiffs asserted that the statutory scheme violated the education article of the Illinois Constitution because the system did not provide a "high quality" education, as required by that article, to students in poorer districts. In considering this claim, this court analyzed whether the quality of the public education system was subject to judicial review. We reasoned that

we must determine "whether the quality of education is capable of or properly subject to measurement by the courts." *Committee for Educational Rights*, 174 Ill. 2d at 24.

This court in *Committee for Educational Rights* concluded that "questions relating to the quality of education are solely for the legislative branch to answer." *Committee for Educational Rights*, 174 Ill. 2d at 24. In reaching this conclusion, we first noted that the education article of the 1970 Constitution corresponded to section 1 of article VIII of the 1870 Constitution, which provided that "[t]he general assembly shall provide a thorough and efficient system of free schools, whereby all children of this State may receive a good common school education." Ill. Const. 1870, art. VIII, § 1. Under that provision, decisions of this court had consistently held that questions relating to the efficiency and thoroughness of the school system were solely for the legislature to answer, and that the courts lacked the power to intrude. *Committee for Educational Rights*, 174 Ill. 2d at 24-25. Although the requirement that schools provide a "good common school education" was recognized to be a limitation on the legislature's power to enact public school laws, that limitation was not among those held generally capable of judicial enforcement. Rather, the only limitations which the courts could enforce were that the schools shall be free and open to all equally. *Committee for Educational Rights*, 174 Ill. 2d at 25, quoting *Fiedler v. Eckfeldt*, 335 Ill. 11, 23 (1929). The court in *Richards v. Raymond*, 92 Ill. 612 (1879), explained the reason for precluding judicial review of the question of what constitutes a "good common school education":

"No definition of a common school is given or specified in the constitution, nor does that instrument declare what course of studies shall constitute a common school education. *** The phrase, 'a common school education' is one not easily defined. One might say that a student instructed

in reading, writing, geography, English grammar and arithmetic had received a common school education, while another who had more enlarged notions on the subject might insist that history, natural philosophy and algebra should be included. It would thus be almost impossible to find two persons who would in all respects agree in regard to what constituted a common school education." *Richards*, 92 Ill. at 617.

This court in *Committee for Educational Rights* proceeded to conclude that the education article of the 1970 Constitution did not alter the role of the courts in this arena. We reasoned that "[c]ourts are no more capable of defining 'high quality educational institutions and services' under our present constitution than they were able to define a 'good common school education' under the 1870 Constitution." *Committee for Educational Rights*, 174 Ill. 2d at 27. We explained that what constitutes a "high quality" education cannot be ascertained by any judicially discoverable or manageable standards and that the constitution provides no principled basis for a judicial definition of "high quality":

"It would be a transparent conceit to suggest that whatever standards of quality courts might develop would actually be derived from the constitution in any meaningful sense. Nor is education a subject within the judiciary's field of expertise, such that a judicial role in giving content to the education guarantee might be warranted. Rather, the question of educational quality is inherently one of policy involving philosophical and practical considerations that call for the exercise of legislative and administrative discretion.

To hold that the question of educational quality is subject to judicial determination would largely deprive the members of the general public of a voice in a matter which is close to the hearts of all individuals in Illinois. *** [A]n open and robust public debate is the lifeblood of the political process in our system of representative democracy. Solutions to problems of educational quality should emerge from a spirited dialogue between the people of the state and their elected representatives." *Committee for Educational Rights*, 174 Ill. 2d at 28-29.

This court accordingly held that, to the extent the plaintiffs' education article claim was based on "perceived deficiencies in the quality of education in public schools," the claim was properly dismissed. *Committee for Educational Rights*, 174 Ill. 2d at 32.

The defendants here argue that the decision in *Committee for Educational Rights* defeats the plaintiffs' attempt to state a claim under the education article. They contend that this court has unequivocally held that it is solely up to the legislature, not the courts, to decide whether an education being provided meets the quality requirements of the constitution. The plaintiffs assert, however, that *Committee for Educational Rights* is not dispositive here because that decision did not address a claim that children were being deprived of a "minimally adequate" education, as opposed to a "high quality" education. The plaintiffs claim that they do not challenge the quality of education in their district but, rather, the "virtual absence" of education in their district. According to the plaintiffs, the courts can and must decide whether students in a particular district are being provided with the "rudimental elements" of education, which the plaintiffs define as "certified teachers, basic instructional materials, and reasonably safe school buildings."

We find the plaintiffs' attempt to distinguish the holding in *Committee for Educational Rights* unpersuasive. That decision did not limit itself to whether the courts could define a "high quality" education but, rather, considered the broadly stated issue of "whether the *quality of education* is capable of or properly subject to measurement by the courts." (Emphasis added.) *Committee for Educational Rights*, 174 Ill. 2d at 24. This court concluded that "questions relating to the *quality of education* are solely for the legislative branch to answer." (Emphasis added.) *Committee for Educational Rights*,

174 Ill. 2d at 24. In fact, we defined the claim raised by the plaintiffs as whether poor school districts provide a "normatively inadequate education." *Committee for Educational Rights*, 174 Ill. 2d at 11. Attempting to distinguish "high quality" from "minimally adequate" in this context is nothing more than semantics. No matter how the question is framed, recognition of the plaintiffs' cause of action under the education article would require the judiciary to ascertain from the constitution alone the content of an "adequate" education. The courts would be called upon to define what minimal standards of education are required by the constitution, under what conditions a classroom, school, or district falls below these minimums so as to constitute a "virtual absence of education," and what remedy should be imposed. Our decision in *Committee for Educational Rights* made clear that these determinations are for the legislature, not the courts, to decide.

The plaintiffs nonetheless argue that judicial review in this case is permitted under the so-called "boundary cases" such as *People ex rel. Leighty v. Young*, 309 Ill. 27 (1923). In *Committee for Educational Rights*, we noted that a "limited exception" to the principle that the courts will not generally decide questions of the thoroughness and efficiency of school systems had been recognized for matters relating to school district boundaries. *Committee for Educational Rights*, 174 Ill. 2d at 16. Under this exception, courts have declared invalid school districts that were configured in such a way as to deny students access to a school. See *People ex rel. Community Unit School District No. 5 v. Decatur School District No. 61*, 31 Ill. 2d 612, 613-14 (1964); *Leighty*, 309 Ill. at 35. The plaintiffs argue that this exception may be applied here because students who are deprived of a minimally adequate education are in reality being deprived of access to an education.

We do not agree that the exception recognized in *Leighty* is applicable here. The plaintiffs have not alleged in this case that schoolchildren are being denied access to schools. Rather, the plaintiffs complain about the quality of the education that is being provided in those schools. The plaintiffs are thus asking this court to define standards for an adequate education derived solely from the constitution, a task which we have already held we cannot undertake. The plaintiffs urge, however, that this court must be permitted to intervene where, for instance, a school district provides a school that consists of nothing more than a vacant building marked with the word "School." This hypothetical situation, of course, is not presented in this case. Moreover, we consider it highly unlikely that the legislature would ever set standards for education so as to allow for such a situation.

Parenthetically, we note that those items which the plaintiffs assert are included within the "rudimental elements" of education, *i.e.*, certified teachers, basic instructional materials, and reasonably safe buildings, are addressed by the Illinois School Code. 105 ILCS 5/21—1 through 21—26 (West 1996) (certification of teachers); 105 ILCS 5/28—1 through 28—21 (West 1996) (instructional materials); 105 ILCS 5/2—3.12 (West 1996) (school building code). The plaintiffs emphasize that they are not challenging the constitutionality of the statutory scheme implemented by the legislature to comply with the education article. To the extent the plaintiffs are deprived of services mandated by the School Code, their relief, if any, lies in an action to enforce the Code.

Accordingly, we hold that the plaintiffs may not state a claim based upon violation of the education article of the Illinois Constitution. The circuit court therefore properly dismissed the plaintiffs' education article claim with prejudice.

## II. Due Process

We next address whether the plaintiffs may state a

cause of action under the due process provisions of the United States and Illinois Constitutions. We hold that the plaintiffs cannot state a claim for a due process violation under either the United States Constitution or the Illinois Constitution.

### A. *Federal Due Process Clause*

We begin our analysis with the federal due process clause. The due process clause of the fourteenth amendment states: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. The plaintiffs here rely on the substantive component of the clause. The substantive component protects fundamental liberty interests against infringement by the government, regardless of the procedures provided. *Reno v. Flores*, 507 U.S. 292, 301-02, 123 L. Ed. 2d 1, 16, 113 S. Ct. 1439, 1447 (1993); *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 117 L. Ed. 2d 261, 273, 112 S. Ct. 1061, 1068 (1992).

Initially, we note that education is not a fundamental right protected by the federal constitution. See *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278 (1973); see also *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 34 (1996). The plaintiffs nonetheless attempt to use the federal due process clause to impose on the defendants the affirmative obligation to provide a "minimally safe and adequate education." The plaintiffs ostensibly advance two theories to support the imposition of this duty under the due process clause. First, the plaintiffs argue that the Illinois compulsory education law constitutes a deprivation of the plaintiffs' liberty, which gives rise to an affirmative duty on the part of the state to provide a minimally adequate education. Second, the plaintiffs assert that this duty arose because the defendants subjected the plaintiffs to state-created dangers. We hold that the plaintiffs may not state a claim for a due process violation under either theory.

## (1) Compulsory Education Law

It is well established that the due process clause does not generally impose any affirmative obligation on the state to provide substantive services to its citizens. *Youngberg v. Romeo*, 457 U.S. 307, 317, 73 L. Ed. 2d 28, 38, 102 S. Ct. 2452, 2459 (1982); *Archie v. City of Racine*, 847 F.2d 1211 (7th Cir. 1988). This is true even if such services may be necessary to secure life, liberty or property interests. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 196, 103 L. Ed. 2d 249, 259, 109 S. Ct. 998, 1003 (1989). Although the due process clause forbids the state itself from depriving individuals of life, liberty, or property without due process of law, its language does not impose an affirmative duty on the state to ensure that those interests are not harmed through other means. *DeShaney*, 489 U.S. at 195, 103 L. Ed. 2d at 259, 109 S. Ct. at 1003. As the Seventh Circuit Court of Appeals has noted, "[t]he Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order." *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982); see also *Archie*, 847 F.2d at 1220-23 (holding that the state has no due process duty to provide rescue services to those in danger).

The Supreme Court has determined, however, that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *DeShaney*, 489 U.S. at 198, 103 L. Ed. 2d at 260, 109 S. Ct. at 1004. In *Estelle v. Gamble*, 429 U.S. 97, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976), the Court recognized that the eighth amendment's prohibition on cruel and unusual punishment, made applicable to the states through the due process clause, required a state to provide medical care to incarcerated prisoners. The *Estelle* Court reasoned that because a prisoner, is " 'by reason of the deprivation

of his liberty,' '' unable to care for himself, it is "just" that the State be required to care for him. *Estelle*, 429 U.S. at 104, 50 L. Ed. 2d at 260, 97 S. Ct. at 291, quoting *Spicer v. Williamson*, 191 N.C. 487, 490, 132 S.E. 291, 293 (1926).

The rationale of *Estelle* was extended beyond the eighth amendment setting in *Youngberg v. Romeo*, 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982). In *Youngberg*, the Supreme Court considered the substantive rights of involuntarily committed mentally retarded persons under the due process clause. After noting that, generally, a state is under no constitutional duty to provide substantive services to individuals, the Court found that "[w]hen a person is institutionalized—and wholly dependent on the State—*** a duty to provide certain services and care does exist." *Youngberg*, 457 U.S. at 317, 73 L. Ed. 2d at 38, 102 S. Ct. at 2459. The Court held that the due process clause obligated the state to provide involuntarily committed persons with such services as are necessary to ensure their safety and freedom from undue restraint. *Youngberg*, 457 U.S. at 319, 73 L. Ed. 2d at 39, 102 S. Ct. at 2460.

The plaintiffs here seek to extend the rationale of *Youngberg* to apply to this case. The premise for the plaintiffs' argument is that the Illinois compulsory education law, mandating that children of a certain age attend school (105 ILCS 5/26—1 (West 1996)), operates as a restriction on the plaintiffs' liberty similar to the restriction on liberty present in *Youngberg*. It is clear, however, that compulsory education is not the type of restraint on liberty envisioned by the Supreme Court in *Estelle* and *Youngberg* as the basis for imposing an affirmative duty on the state.

The language used by the Court in *Youngberg* demonstrates the distinction. There, the Court stated that a duty to provide certain services and care would be

imposed on a state when a person is institutionalized and therefore "wholly dependent on the State." *Youngberg*, 457 U.S. at 317, 73 L. Ed. 2d at 38, 102 S. Ct. at 2459. Moreover, the Supreme Court clarified the limited scope of the *Youngberg* holding in a subsequent case. In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 103 L. Ed. 2d 249, 109 S. Ct. 998 (1989), the Court considered whether the state had violated a child's substantive due process rights by failing to provide him with protection against his father's violence. The evidence showed that the county and its department of social services had been made aware of numerous instances of suspected abuse of the child by his father, had investigated the instances, and had taken temporary custody of the child. The child was, however, returned to the custody of his father, who ultimately beat the child severely. The child, through his guardian, sued the governmental defendants claiming that their failure to protect him deprived him of his liberty in violation of the due process clause.

The *DeShaney* Court reiterated the well-established principle that the due process clause is a limitation on the state's power to act and does not confer any affirmative right to governmental aid. The plaintiff, however, argued that an affirmative duty to provide protective services on the part of the state may arise out of certain "special relationships" created or assumed by the state with respect to particular individuals, and that such a relationship existed in that case. The Court rejected this argument. In so doing, the Court explained the holdings of *Estelle* and *Youngberg* as follows:

"Taken together, [these cases] stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. [Citation.] The rationale for this principle is simple enough:

when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. [Citations.] The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. [Citation.] In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint or personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *DeShaney*, 489 U.S. at 199-200, 103 L. Ed. 2d at 261-62, 109 S. Ct. at 1005-06.

The plaintiffs attempt to equate the restraint on schoolchildren's liberty imposed by compulsory education laws with the restraint on liberty discussed in *Youngberg*. It is apparent, however, that the *Youngberg* "custody" exception to the general rule that the due process clause imposes no affirmative obligation on a state to provide aid or services is not applicable to the facts of this case. As explained in *DeShaney*, a much different sort of restraint is required in order to trigger a duty on the part of the state to provide aid or services. The *DeShaney* Court specifically described the requisite restraint by the state as "incarceration, institutionalization, *or other similar restraint.*" (Emphasis added.) *DeShaney*, 489 U.S. at 200, 103 L. Ed. 2d at 262, 109 S. Ct. at 1006. Notably, in a subsequent case, although not directly addressing the issue, the Supreme Court stated that public schools do not have such a degree of control over children as to give rise to a "duty to protect" under *DeShaney*. *Vernonia School District 47J v. Acton*, 515

U.S. 646, 655, 132 L. Ed. 2d 564, 576, 115 S. Ct. 2386, 2392 (1995); see also *Ingraham v. Wright*, 430 U.S. 651, 669, 670, 51 L. Ed. 2d 711, 729, 729, 97 S. Ct. 1401, 1411, 1412 (1977) (holding that the eighth amendment's prohibition on cruel and unusual punishment did not apply to the paddling of schoolchildren and rejecting the argument that compulsory education laws placed students in a position similar to that of incarcerated prisoners. The Court explained that prisoners and schoolchildren stand in "wholly different circumstances," and that, "[t]hough attendance may not always be voluntary, the public school remains an open institution").

Numerous decisions from the federal courts of appeals have directly addressed this issue and have concluded that compulsory education laws do not give rise to affirmative duties on the part of the state to provide the protections accorded institutionalized persons. See, *e.g.*, *Dorothy J. v. Little Rock School District*, 7 F.3d 729, 732 (8th Cir. 1993); *Maldonado v. Josey*, 975 F.2d 727, 732 (10th Cir. 1992); *D.R. by L.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364, 1372 (3d Cir. 1992); *J.O. v. Alton Community Unit School District 11*, 909 F.2d 267, 272 (7th Cir. 1990). The Seventh Circuit Court of Appeals explained the qualitative difference between compulsory education laws and the types of restraints on liberty that trigger affirmative obligations on the part of the state:

"We do not suggest that prisoners and mental patients are an exhaustive list of all persons to whom the state owes some affirmative duties, but the government, acting through local school administrations, has not rendered its schoolchildren so helpless that an affirmative constitutional duty to protect arises. Whatever duty of protection does arise is best left to laws outside the Constitution ***. [Citation.]

The state's custody over their person is the most distinguishing characteristic in the cases of the mental patient and the prisoner; these people are unable to provide

for basic human needs like food, clothing, shelter, medical care, and reasonable safety. [Citation.] At most, the state might require a child to attend school, [citation], but it cannot be suggested that compulsory school attendance makes a child unable to care for basic human needs." *J.O.*, 909 F.2d at 272.

The plaintiffs attempt to distinguish this consistent line of authority by asserting that those cases were concerned merely with whether compulsory education laws established a custodial situation which gave rise to a "duty to protect" schoolchildren. The plaintiffs argue that, here, they are not asserting a duty to protect, but a duty to provide a "minimally adequate education." The plaintiffs contend that, in this case, the only question is whether compulsory attendance laws infringe on students' liberty "in some significant manner." The plaintiffs' argument is not persuasive. As noted earlier, the due process clause does not generally impose any affirmative duty on the state to provide aid or services. In *Youngberg*, the Supreme Court recognized a limited exception to this general rule where an individual is in the custody of the state. The plaintiffs rely on this exception to avoid the general rule. This exception, as stated in *Youngberg* and clarified in *DeShaney*, requires a more significant restraint on an individual's liberty than that imposed by compulsory education laws. *DeShaney*, although addressing whether a duty to protect is imposed on the state, nonetheless clarifies the type of restraint on liberty which is necessary under *Youngberg*. Accordingly, *DeShaney*, and the courts of appeal decisions, interpreting it in the school context, are relevant here.

The plaintiffs nonetheless assert that *Youngberg* supports their claim in this case because the Court there held that when the state takes custody of an individual, due process requires some rational relationship between the nature and duration of the commitment and its purpose. The plaintiffs contend that, because the state

deprives children of their liberty by compelling school attendance, under this proposition, the state owes them a duty to provide a certain standard of education. First, we note that *Youngberg* did not actually assert this holding. Rather, the plaintiffs glean this proposition from a footnote in *Youngberg* which discussed a *procedural* due process case. *Youngberg*, 457 U.S. at 320 n.27, 73 L. Ed. 2d at 40 n.27, 102 S. Ct. at 2460 n.27, citing *Jackson v. Indiana*, 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972). Further, as discussed above, the type of restraint on liberty contemplated in *Youngberg* is not present in the school context. Thus, *Youngberg* does not support the theory that due process requires a certain standard of education be provided where school attendance is mandated by state law. The other case cited by the plaintiffs for this proposition, *Woe v. Cuomo*, 729 F.2d 96 (2d Cir. 1984), illustrates this point. *Woe* held that the " 'massive curtailment of liberty' associated with involuntary commitment, [citation], dictates that the 'nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.' " *Woe*, 729 F.2d at 105, quoting *Jackson v. Indiana*, 406 U.S. 715, 738, 32 L. Ed. 2d 435, 451, 92 S. Ct. 1845, 1858 (1972). It is important to note that the plaintiffs are not here seeking to invalidate the Illinois compulsory attendance law on the ground that it is an unreasonable restraint on their liberty. Rather, they are seeking to use the due process clause to impose on the defendants an affirmative duty to provide a certain standard of education. Because the clause does not generally impose such affirmative duties, the plaintiffs must establish a basis for creating that duty. The plaintiffs have attempted to use *Youngberg* to create that duty. For the reasons discussed above, *Youngberg* does not apply. In essence, the plaintiffs are attempting to create a federal constitutional right to a particular standard of education based solely on the

fact that school attendance is compulsory in this state. The Supreme Court has cautioned that it is "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. Harker Heights*, 503 U.S. 115, 125, 117 L. Ed. 2d 261, 273, 112 S. Ct. 1061, 1068 (1992). We do not agree that the due process clause should be expanded in the manner requested by the plaintiffs here.

Accordingly, we hold that the *Youngberg* "custody" exception to the general rule that substantive due process does not impose an affirmative duty on the state to provide services is not applicable here.

### (2) State-created Danger

The plaintiffs alternatively argue that their substantive due process claim may be sustained on the theory that the defendants have "created and perpetuated a school environment that is dangerous to plaintiffs' health and safety." Pursuant to this theory, the plaintiffs seek a holding that the defendants owe them a duty, under the due process clause, to protect them from unsafe conditions in the schools by remedying these conditions. We note that the plaintiffs do not here assert that any act of the defendants has directly harmed an interest of the plaintiffs protected under the due process clause. Rather, the plaintiffs seek to impose a duty on the defendants to take action to protect the plaintiffs from these allegedly unsafe conditions. The plaintiffs are thus again attempting to use the due process clause to impose an affirmative duty on the defendants.

The plaintiffs' argument on this point is not entirely clear. The plaintiffs partially rely on cases addressing claims that the conditions in prisons and other detention facilities are so abhorrent that they violate the due process rights of the inmates. As the defendants point out, however, those cases address the state's constitutional

obligations to persons in its custody. See, *e.g., Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (prison conditions); *Gary H. v. Hegstrom*, 831 F.2d 1430 (9th Cir. 1987) (juvenile detention facility conditions); *French v. Owens*, 777 F.2d 1250 (7th Cir. 1985) (prison conditions). As discussed above, children mandated to attend school by state law are not in the custody of the state as contemplated by these cases.

The plaintiffs also rely on another line of cases. A number of federal courts of appeals have held that *DeShaney* recognized a second exception to the general rule that the due process clause does not impose affirmative obligations on the state. These cases hold that the due process clause imposes a duty on the state to protect or care for citizens when the state "affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993); see also *Dorothy J. v. Little Rock School District*, 7 F.3d 729, 733 (8th Cir. 1993); *D.R. by L.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364, 1373 (3d Cir. 1992). In order to employ the "state-created danger" theory, the plaintiff must "plead facts showing some *affirmative act* on the part of the state that either created a danger to the plaintiff or rendered him more vulnerable to an existing danger." (Emphasis in original.) *Stevens v. Umsted*, 131 F.3d 697, 705 (7th Cir. 1997); see also *D.R.*, 972 F.2d at 1374; *Reed*, 986 F.2d at 1125. Mere inaction by state actors, even in the face of a known danger, is not sufficient to trigger an affirmative duty on the part of the state under this theory. *Stevens*, 131 F.3d at 705; *Reed*, 986 F.2d at 1125.

Although a number of decisions have recognized a "state-created danger" exception in some form, the plaintiffs cite to only a few cases which have held that a plaintiff could pursue a substantive due process claim on

this theory. The claims made in those cases are quite unlike the claim made by the plaintiffs here. In *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992), a nurse at a medium security custodial institution for young male offenders was raped by an inmate after her supervisors required her to work alone with the inmate, who was a known violent sex offender. The *L.W.* court held that the nurse could pursue a due process claim because the actions of the state defendants created the danger to which the nurse fell victim, a danger which would not otherwise have existed. *L.W.*, 974 F.2d at 122-23. In *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), police officers arrested a drunk driver and impounded his car, leaving the driver's passenger stranded in a high crime area in the middle of the night. The passenger was raped as she attempted to make her way home. The *Wood* court held that the passenger could pursue her constitutional claim against the defendant officer because his acts triggered a duty on his part to afford her "some measure of peace and safety." *Wood*, 879 F.2d at 589-90.

Likewise, in *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979),[1] the court sustained a due process claim where a police officer arrested the driver of a car and left several children stranded in the car on the side of a busy highway. In *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), the court held that the plaintiffs, undercover police officers, could pursue a due process claim under the state-created danger theory where the city released the plaintiffs' personal information to counsel for criminal defendants whom the plaintiffs had aided in apprehending. The *Kallstrom* court reasoned that the city's actions placed the officers in "special danger" that a private actor would deprive them of their liberty interest in personal security. Finally, in *Ross v.*

---

[1] *White* was decided prior to *DeShaney* and its usefulness in interpreting the *DeShaney* exceptions is therefore questionable.

*United States*, 910 F.2d 1422 (7th Cir. 1990), the court allowed the plaintiff's due process claim to proceed against governmental defendants who affirmatively prevented people from rescuing the plaintiff's drowning son. The court reasoned that, having placed the plaintiff's decedent in that position, the defendants owed him a duty to provide rescue services. The plaintiffs also cite to *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993). In *Reed*, the court held that the plaintiffs could state a claim for a due process violation under allegations that the police arrested a sober driver and left a drunk passenger in the car, which passenger thereafter drove the car and caused a fatal accident with the plaintiffs. The *Reed* court also noted, however, that the plaintiffs would face an "insurmountable hurdle" on summary judgment because the record showed that the driver the police removed was not sober, as alleged, but was intoxicated. The court noted that, because of that fact, the state could not be liable because the state action did not place the plaintiffs in a position of danger they would not otherwise have faced. *Reed*, 986 F.2d at 1125.

Here, the plaintiffs claim simply a due process right to a "safe environment," and allege that certain unsafe conditions exist at various schools. Specifically, the plaintiffs allege that "most" of the school buildings in the district are in "disrepair." In support, the plaintiffs cite to fires and flooding which have occurred, the presence of asbestos, cracked and leaking roofs, faulty heating systems, unsanitary restrooms, burnt-out lightbulbs, malfunctioning windows and water fountains, fire hazards, pests, and cafeterias that serve cold and nonnutritious meals. The cited events occurred in various schools at various times over a time period encompassing the years 1989 through 1995. The plaintiffs blame each of these conditions on the District defendants' failure to maintain the buildings in compliance with the School

Building Code. Notably, the plaintiffs do not allege that any student has actually been injured by any of these conditions. Rather, the complaint asserts that classes have been canceled and that rooms or areas have been sealed off as a result of these conditions.

The plaintiffs' allegations do not state a claim under the state-created danger theory. First, a review of the complaint reveals that the plaintiffs' claim amounts to allegations that the defendants have failed to act to alleviate certain allegedly unsafe conditions. The plaintiffs charge that the state of disrepair existing at some of the schools is due to the "neglect" of the defendants, namely, the defendants' failure to take measures to address or alleviate the alleged hazardous conditions. As discussed above, those decisions recognizing the "state-created danger" theory require the state actors to have taken *affirmative action* to place the plaintiff in a position of danger from which the state actors then failed to protect the plaintiff. See *Stevens*, 131 F.3d at 705; *Graham v. Independent School District No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994). Mere inaction is not enough. *Stevens*, 131 F.3d at 705; *Reed*, 986 F.2d at 1125. Here, the plaintiffs are alleging, at most, inaction on the part of the defendants in allowing these conditions to develop or persist. Further, the only injury resulting from these conditions cited by the complaint is class time that was lost because the defendants canceled classes or cordoned off rooms or areas. The complaint thus pleads that the defendants in fact took steps to protect the plaintiffs from physical harm from these conditions. Absent allegations that the defendants took affirmative action to create or increase the danger and then failed to reasonably respond to protect the plaintiffs, the plaintiffs have not stated a claim under the state-created danger theory.

In addition, the mere fact that some District school buildings are in disrepair cannot be found to state a

substantive due process claim. The due process clause "does not transform every tort committed by a state actor into a constitutional violation." *DeShaney*, 489 U.S. at 202, 103 L. Ed. 2d at 263, 109 S. Ct. at 1006. The plaintiffs' claim in this regard is analogous to the claim rejected by the Supreme Court in *Collins v. City of Harker Heights*, 503 U.S. 115, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992). In that case, the widow of a deceased city employee brought an action alleging that the city violated her husband's substantive due process rights as a result of his death by asphyxia when he entered a manhole to unstop a sewer line. The plaintiff alleged that the city, although cognizant of the hazards of working in sewer lines and manholes, did not train its employees about those hazards, did not provide safety equipment at jobsites, and did not provide safety warnings. The plaintiff claimed that the city deprived her husband of life and liberty by failing to provide him with a "reasonably safe work environment." *Collins*, 503 U.S. at 125-26, 117 L. Ed. 2d at 273, 112 S. Ct. at 1069. The Supreme Court rejected the plaintiff's attempt to bring her claim within the purview of the due process clause. The Court reasoned that "[n]either the text nor the history of the Due Process Clause supports petitioner's claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." *Collins*, 503 U.S. at 126, 117 L. Ed. 2d at 274, 112 S. Ct. at 1069. The Court added:

> "Petitioner's claim is analogous to a fairly typical state-law tort claim: The city breached its duty of care to her husband by failing to provide a safe work environment. Because the Due Process Clause 'does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society,' [citation], we have previously rejected claims that the Due Process Clause should be interpreted to

impose federal duties that are analogous to those traditionally imposed by state tort law." *Collins*, 503 U.S. at 128, 117 L. Ed. 2d at 275, 112 S. Ct. at 1070.

See also *Dorothy J.*, 7 F.3d at 733 (holding that plaintiff's allegation that school officials failed to protect students from a known violent student is the kind of "traditional tort law" claim that the Supreme Court has refused to translate into a due process violation); *Maldonado v. Josey*, 975 F.2d 727, 733 (10th Cir. 1992) (noting that "the Due Process Clause 'does not transform every tort committed by a state actor into a constitutional violation' " in rejecting plaintiff's due process claim based on her child's accidental death in school cloakroom), quoting *DeShaney*, 489 U.S. at 202, 103 L. Ed. 2d at 263, 109 S. Ct. at 1006.

As in *Collins*, the claim made by the plaintiffs here, that the conditions in the schools are unsafe, is not a substantive due process claim. Rather, the plaintiffs are simply attempting to use the due process clause to "supplant traditional tort law." The plaintiffs contend that *Collins* is distinguishable because the decedent employee in that case had voluntarily chosen to work for the city. In contrast, the plaintiffs assert, they are forced by state law to attend school. Again, the plaintiffs are attempting to merge the two *DeShaney* exceptions, "custody" and "state-created danger," to support their theory that substantive due process obligates the state to provide a "safe and adequate education." We have already held that the plaintiffs' liberty is not so restricted by compulsory education that a duty to provide affirmative protections or services arises under the due process clause pursuant to the "custody" exception.

The cases cited by the plaintiffs for the proposition that the state-created danger theory has been applied in the school setting are inapposite. In both *Doe v. Taylor Independent School District*, 15 F.3d 443 (5th Cir. 1994), and *Stoneking v. Bradford Area School District*, 882 F.2d

720 (3d Cir. 1989), the plaintiff-students were sexually abused by teachers. Thus, in both cases, the plaintiff was injured directly by the acts of a state actor and the *DeShaney* exceptions were not applicable. See *Doe*, 15 F.3d at 451 n.3 (noting that *DeShaney* does not suggest that individuals have no due process rights against an offending state actor); *Stoneking*, 882 F.2d at 725 (stating that nothing in *DeShaney* suggests that state officials may escape liability arising from direct harm caused by the actions of state actors). Likewise, in *Waechter v. School District No. 14—030*, 773 F. Supp. 1005, 1009 (W.D. Mich. 1991), the defendant school official's affirmative action caused a student's death. As noted earlier in this opinion, there is a significant difference between using the due process clause as a source of protection from deprivation of liberty interests by the government, and using it as a source of rights to governmental services. The plaintiffs here seek to use the clause to impose an affirmative duty on the defendants. None of the cited cases, however, involved the imposition of an affirmative duty on the state pursuant to the due process clause.

Accordingly, the cases that have imposed an affirmative obligation on the state under the due process clause based on a "state-created danger" theory are not applicable here.

(3) Conclusion—Federal Due Process Clause

We therefore hold that the plaintiffs' complaint fails to state a claim for a violation of the federal due process clause. The circuit court's judgment dismissing this claim with prejudice is affirmed.

B. *Illinois Due Process Clause*

The plaintiffs also contend that they have stated a claim for violation of their due process rights under article I, section 2, of the Illinois Constitution of 1970. The plaintiffs argue that the Illinois due process provi-

sion should be construed more broadly than the federal due process clause.

The plaintiffs correctly note that this court will construe independently the scope of our state constitution's due process guarantee. See *Rollins v. Ellwood*, 141 Ill. 2d 244, 275 (1990). This court has interpreted our state due process clause to provide greater protections than its federal counterpart where we found an appropriate basis to do so. See *People v. Washington*, 171 Ill. 2d 475, 485-86 (1996); *People v. McCauley*, 163 Ill. 2d 414, 440 (1994). Nonetheless, federal precedent interpreting the federal due process clause is useful as a guide in interpreting the Illinois provision. *McCauley*, 163 Ill. 2d at 436; *Rollins*, 141 Ill. 2d at 275.

The plaintiffs have provided no basis for a broader construction of the Illinois due process clause in this context. They cite to no Illinois case that construes the state provision in a manner similar to that urged here. The plaintiffs simply reassert the arguments advanced in support of their claim that the federal due process clause imposes a duty on the defendants to provide the plaintiffs with a minimally safe and adequate education. We find no reason to construe our state due process clause differently than the federal clause on this particular issue. We therefore hold that the plaintiffs have failed to state a claim for a violation of the Illinois due process clause.

### III. School Code

We next address whether the plaintiffs may state a claim based upon the Illinois School Code. The plaintiffs' complaint alleges that the defendants violated various sections of the School Code (105 ILCS 5/1—1 *et seq.* (West 1996)), and regulations promulgated thereunder, by providing the plaintiffs with "unsafe, educationally inadequate public schools."

The defendants first acknowledge that, under this court's holding in *Noyola v. Board of Education*, 179 Ill.

2d 121 (1997), the plaintiffs may pursue an action for *mandamus* to compel compliance by the defendants with certain duties imposed by the School Code. *Noyola* was decided after the appellate court opinion was filed in this case and the appellate court, therefore, did not consider its impact on this case. In *Noyola*, parents of economically disadvantaged Chicago school students alleged that the Chicago and state boards of education violated provisions of the School Code by the manner in which they allocated certain funds. The plaintiffs contended that they had an implied private right of action to compel the defendants' compliance with the School Code. After examining the history and purpose of implied private rights of action, this court determined that such an action was not the appropriate vehicle for the plaintiffs' claim. Rather, this court concluded, an action for *mandamus* was the proper avenue for the plaintiffs' claim. The court explained that:

"[u]nlike the [implied private right of action] cases cited above, the plaintiffs in this case are not attempting to use a statutory enactment as the predicate for a tort action. What they want is to force the public officials responsible for implementing section 18—8(A)(5)(i) to do what the law requires.

*** Where, as alleged here, public officials have failed or refused to comply with requirements imposed by statute, the courts may compel them to do so by means of a writ of *mandamus*, provided that the requirements for that writ have been satisfied." *Noyola*, 179 Ill. 2d at 132.

This court in *Noyola* concluded that the plaintiffs could pursue a *mandamus* action to compel the defendants' compliance with section 18—8(A)(5)(i)(1) of the School Code. The court reasoned that section 18—8(A)(5)(i)(1) imposed specific requirements regarding the use of the funds in question, and that the plaintiffs' complaint had alleged that the defendants used the funds in violation of those requirements. *Noyola*, 179 Ill. 2d at 135.

Pursuant to *Noyola*, we hold that the plaintiffs in

this case may be entitled to pursue a *mandamus* action against the defendants. The plaintiffs here do not seek to use the defendants' alleged violations of the School Code as a basis for imposing tort liability on the defendants for injuries caused by the violations. Rather, as in *Noyola*, the plaintiffs seek to force the public officials responsible for implementing various sections of the School Code to do what the law requires. The plaintiffs' complaint does not explicitly seek a writ of *mandamus*. The same was true in *Noyola*, however, and this court nonetheless construed the complaint as sufficiently pleading a *mandamus* action. *Noyola*, 179 Ill. 2d at 135. We must therefore review the allegations of the plaintiffs' complaint to ascertain whether they have pled the necessary elements for a writ of *mandamus*.

*Mandamus* is an extraordinary remedy to enforce, as a matter of right, "the performance of official duties by a public officer where no exercise of discretion on his part is involved." *Madden v. Cronson*, 114 Ill. 2d 504, 514 (1986). A writ of *mandamus* will not be granted unless the plaintiff can show a clear, affirmative right to relief, a clear duty of the defendant to act, and clear authority in the defendant to comply with the writ. *Noyola*, 179 Ill. 2d at 133; *Orenic v. Illinois State Labor Relations Board*, 127 Ill. 2d 453, 467-68 (1989); *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 507 (1994). "The writ will not lie when its effect is 'to substitute the court's judgment or discretion for that of the body which is commanded to act.' " *Chicago Ass'n of Commerce & Industry v. Regional Transportation Authority*, 86 Ill. 2d 179, 185 (1981), quoting *Ickes v. Board of Supervisors*, 415 Ill. 557, 563 (1953).

The plaintiffs' allegations regarding the defendants' violations of the School Code are brief. The plaintiffs

simply reincorporate by reference all of the prior allegations of the complaint and add the following paragraph:

"By providing plaintiffs with unsafe, educationally inadequate public schools, the Defendants have violated and are violating Sections 2—3.25, 2—3.3, 2—3.6, 10—10, 10—20.19a, 10—21.4, 10—22.18, and 27—1 of the Illinois School Code and Regulations promulgated thereunder, including Ill. Admin. Code title 23, Sections 1, 125, 185 and 254."

We find that, unlike in *Noyola*, we are not able to glean from the plaintiffs' complaint, as currently pled, the necessary allegations for a *mandamus* action. The plaintiffs provide no explanation of what duties the cited sections impose on the defendants, nor do they provide any explanation of how the defendants violated these sections. They have not pled any specific acts or omissions by the defendants that violate official duties imposed on them by the School Code. The dismissal of the plaintiffs' School Code claim must therefore be affirmed. That dismissal, however, should be without prejudice to the plaintiffs to file an amended complaint asserting their School Code claim. If the plaintiffs choose to replead their statutory claim, they must specify the statutory provisions and the acts or omissions of the defendants which entitle them to *mandamus* relief.

We note that the parties dispute the permissible scope of a *mandamus* action. The defendants argue that the plaintiffs may pursue *mandamus* to compel the defendants' performance only of statutory duties that are purely ministerial in nature, allowing no exercise of discretion by the official. The plaintiffs contend, on the other hand, that even a discretionary function may be compelled by means of a writ of *mandamus* under certain circumstances.

Given the factual insufficiency of the plaintiffs' allegations, we do not find it advisable to decide here whether, or under what circumstances, *mandamus* may

ever be pursued to compel the performance of a statutory duty that involves the exercise of discretion. If the plaintiffs choose to replead their statutory claim, each statutory duty the plaintiffs seek to enforce through *mandamus* will have to be evaluated to ascertain if the elements of the writ are satisfied. Thus, as to each allegation, a determination must be made as to whether the particular statutory provision imposed a clear duty to act on a defendant and whether it granted the plaintiffs a clear right to the relief requested. See *Noyola*, 179 Ill. 2d at 133. Without the benefit of factually sufficient allegations by the plaintiffs, we cannot determine whether *mandamus* would be proper to remedy any of the defendants' alleged acts or omissions. We therefore remand this cause to the circuit court to allow the plaintiffs the opportunity to plead an action for *mandamus*.

The plaintiffs also contend that, to the extent that *mandamus* is not appropriate for any of their statutory claims, they may pursue those claims under an implied private right of action theory. *Noyola* disposes of this argument. As noted, this court in *Noyola* extensively reviewed the history and purpose of implied private rights of action. The court reasoned that, in Illinois, an implied private right of action under a statute is a means by which a plaintiff may pursue a tort action. If a statute is construed as providing an implied private right of action, the plaintiff may pursue a tort action against a defendant whose violation of the statute proximately caused injury to the plaintiff. *Noyola*, 179 Ill. 2d at 129-31 (citing *Rodgers v. St. Mary's Hospital*, 149 Ill. 2d 302 (1992), *Corgan v. Muehling*, 143 Ill. 2d 296 (1991), and *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 89 Ill. 2d 379 (1982)). The *Noyola* court concluded that those cases recognizing an implied private right of action were inapplicable to the case before it because the *Noyola* plaintiffs were not

attempting to use a statute as a predicate for a tort action. Rather, the plaintiffs sought to compel the public officials responsible for implementing the statutory provision to comply with the law. Accordingly, this court held, the appropriate avenue of relief for the plaintiffs was a writ of *mandamus*, provided that the requirements for that writ had been satisfied. *Noyola*, 179 Ill. 2d at 132.

Here, as in *Noyola*, the plaintiffs do not seek to use the School Code as a predicate for a tort action but, rather, apparently seek to compel the public officials responsible for implementing the Code to fulfill their duties under the Code. The appropriate avenue of relief for the plaintiffs is therefore an action for a writ of *mandamus*, provided the elements of the writ have been satisfied, and not an implied private right of action under the School Code.

We therefore hold that the circuit court's dismissal of the plaintiffs' School Code claim must be affirmed. That dismissal, however, is without prejudice to the plaintiffs to file an amended complaint asserting a *mandamus* action to compel compliance with official duties under the School Code.

### IV. Common Law

We next address whether the plaintiffs have sufficiently pled a common law claim against the District defendants. We hold that the trial court correctly dismissed this claim with prejudice.

The section of the plaintiffs' complaint that purports to state a common law claim reincorporates by reference all of the prior allegations of the complaint and then adds the following sentence:

"By requiring plaintiffs to attend unsafe public schools, defendants have violated common law duties owed to each class member not to subject them to unreasonably dangerous and hazardous conditions."

These allegations are not sufficient to state a common law claim against the District defendants. The plaintiffs allege merely that the defendants have violated "common law duties," without specifying what those duties are or what acts or omissions of the defendants breached those duties. In their brief, the plaintiffs assert a premises liability theory in support of this claim. They argue that the District defendants have violated the duty owed by landowners to protect invitees on their premises from physical harm caused by conditions on the premises. See *Ward v. K mart Corp.*, 136 Ill. 2d 132, 146 (1990). A landowner is liable for physical harm caused to invitees by a condition on the land if the owner (1) knows or should know of the condition and that it presents an unreasonable risk of harm to such invitees; (2) should expect that invitees will not discover the danger or protect themselves against it; and (3) fails to exercise reasonable care to protect invitees against the danger. *Ward*, 136 Ill. 2d at 146, citing Restatement (Second) of Torts § 343 (1965).

The plaintiffs cite to several cases in which a public school district has been sued under a premises liability theory. In each of those cases, however, the action was brought on behalf of a child who was injured as a result of an allegedly dangerous condition on the school's premises. See, *e.g.*, *Sidwell v. Griggsville Community Unit School District No. 4*, 146 Ill. 2d 467 (1992); *Ward v. Community Unit School District No. 220*, 243 Ill. App. 3d 968 (1993); *Jastram v. Lake Villa School District 41*, 192 Ill. App. 3d 599 (1989). Here, in contrast, the plaintiffs do not seek damages for an injury they sustained as a result of an allegedly unsafe condition on school property. The plaintiffs do not even allege that any student has been injured by one of these conditions. As stated above, premises liability imposes liability on a landowner for an injury resulting from an unreasonably dangerous

condition on their land. The plaintiffs' claim thus does not state a cause of action under this theory.

In their brief, the plaintiffs also rely on several cases in which injunctive relief was issued to abate a nuisance. See *Village of Wilsonville v. SCA Services, Inc.*, 86 Ill. 2d 1 (1981); *Parr v. Neal*, 187 Ill. App. 3d 58 (1989); *Fink v. Board of Trustees of Southern Illinois University*, 71 Ill. App. 2d 276 (1966). The plaintiffs' reliance on these cases is misplaced. A mandatory injunction is an extraordinary remedy which may be granted when a plaintiff establishes that his remedy at law is inadequate and that he will suffer irreparable harm without the injunctive relief. *Sadat v. American Motors Corp.*, 104 Ill. 2d 105, 115 (1984). Mandatory injunctions are not favored by the courts and are issued only when the plaintiff has established a clear right to relief and the court determines that the urgency of the situation necessitates such action. *Sadat*, 104 Ill. 2d at 116; *Tim Thompson, Inc. v. Village of Hinsdale*, 247 Ill. App. 3d 863, 874 (1993).

Apparently, in advancing this argument, the plaintiffs seek a mandatory injunction ordering the District defendants to remedy the allegedly unsafe conditions in the District schools. The plaintiffs' complaint does not plead the elements necessary for the issuance of a mandatory injunction, however. In each of the cases cited by the plaintiffs, an injunction was issued to abate a particular hazardous condition or activity. See *Wilsonville*, 86 Ill. 2d at 37 (affirming mandatory injunction requiring operator of chemical waste disposal site to remove all toxic waste); *Parr*, 187 Ill. App. 3d at 63 (affirming injunction barring state prison from continuing to operate firing range); *Fink*, 71 Ill. App. 2d at 282 (affirming injunction barring defendant from discharging sewage into river). In contrast, the plaintiffs' complaint does not explain precisely what unsafe condition or conditions exist that are in such urgent need of repair that a mandatory

injunction is warranted. Rather, the complaint simply alleges, generally, that the conditions in the schools are "squalid" and cites examples of conditions that have existed in various schools at various times since 1989. These allegations are not sufficient to warrant the extraordinary remedy of a mandatory injunction.

Accordingly, we hold that the plaintiffs' complaint does not state a claim against the District defendants based upon their breach of common law duties. The plaintiffs have not provided any basis for us to grant them relief for injuries which have not occurred, and which may never occur. The trial court's order dismissing the plaintiffs' common law claim with prejudice is therefore affirmed.

## CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the appellate court's judgment. The appellate court judgment reversing the dismissal with prejudice of the plaintiffs' education article, due process, and common law claims is reversed. The circuit court's dismissal with prejudice of each of those claims is affirmed. The appellate court judgment reversing the dismissal with prejudice of the plaintiffs' School Code claim is affirmed, as modified. The circuit court's dismissal of that claim is affirmed, but that dismissal is without prejudice to the plaintiffs to file an amended complaint asserting their School Code claim in accordance with this opinion. The cause is remanded to the circuit court.

*Appellate court judgment affirmed in part
and reversed in part;
circuit court judgment affirmed in part
and reversed in part;
cause remanded.*

CHIEF JUSTICE FREEMAN, concurring in part and dissenting in part:

In *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 23-32 (1996), this court shut the courthouse door to claims alleging violations of section 1 of the education article of the Illinois Constitution (Ill. Const. 1970, art. X, § 1). In this case, the majority nails that door shut. The majority holds that these plaintiffs *may* not—not do not, or could not, but *may* not—state a cause of action for a declaratory judgment based on a violation of the education article. 186 Ill. 2d at 210-11. Relying on *Committee for Educational Rights*, the majority concludes that plaintiffs raise a nonjusticiable political question, which is addressed solely to the legislature.

The majority views plaintiffs as asking Illinois courts "to enter the arena of Illinois public school policy." 186 Ill. 2d at 201. I respectfully disagree. I view plaintiffs as simply asking the judicial department of state government to do its job and interpret the Illinois Constitution. I still am of the opinion that a claim alleging a violation of section 1 of the education article is justiciable. *Committee for Educational Rights*, 174 Ill. 2d at 45-58 (Freeman, J., concurring in part and dissenting in part). In this case, I agree with the appellate court that, at the least, plaintiffs *could* allege sufficient facts to state a cause of action for a declaratory judgment. Accordingly, I dissent from part I of the majority opinion.

## BACKGROUND

This claim is before us following its dismissal pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1994)). A section 2—615 motion to dismiss attacks the legal sufficiency of a complaint. In ruling on the motion, a court must accept as true all well-pled facts in the complaint and all reasonable inferences which can be drawn therefrom. The motion presents the question of whether the allegations of the com-

plaint, when viewed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. A cause of action will not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved which will entitle the plaintiff to recover. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 86 (1996). Review is *de novo. Vernon v. Schuster*, 179 Ill. 2d 338, 344 (1997).

The majority relates the physical condition of public schools in East St. Louis School District 189. 186 Ill. 2d at 202. However, the majority does not adequately relate the effect that these abhorrent physical conditions have on schoolchildren. I agree with the appellate court that the complaint's introductory section accurately reflects the factual allegations in the body of the complaint:

" 'For themselves, and on behalf of all school-age children in East St. Louis School District 189 ***, Plaintiffs bring this class action to enforce their constitutional and statutory rights to a safe and adequate public school education.

By any reasonable measure, the public schools of District 189 are neither safe nor adequate. Strangers wander in and out of junior high schools. Fire alarms malfunction, and firefighters find emergency exits chained shut as they rescue children from burning schools. Classrooms are sealed to protect students from asbestos and dangerous structural flaws.

In dark corridors, light bulbs go unreplaced and rain seeps through leaky roofs. In heavy rains backed-up sewers flood school kitchens, boilers, and electrical systems, resulting in student evacuations and cancelled classes. Bathrooms are unsanitary and water fountains are dry or spew brown water.

In winter, students sit through classes wearing heavy coats because broken windows and faulty boilers go unrepaired. They struggle to learn using meager instructional equipment and tattered, dated textbooks. School libraries are locked or destroyed by fire. Children never know whether they will have a teacher, since District 189 is chronically short staffed, and teachers are often absent or

disengaged from students.

In these squalid surroundings, and denied adequate instruction, children cannot reasonably be expected to learn. On standardized tests, District 189 students score significantly below students in other districts, and most fail to achieve official State minimum goals. Deprived of even a minimally adequate education, barely half the District's students graduate from high school, and many who manage to graduate are ill-prepared for skilled jobs, college or meaningful participation in a democratic society. Defendants are legally obligated to take all measures necessary to provide Plaintiffs with such an education, yet, for decades, [they] have knowingly allowed conditions and services to deteriorate so that District 189 now provides one of the worst school systems in the nation.

Plaintiffs bring this action to correct these intolerable and illegal conditions ***. ***

Plaintiffs seek an order compelling Defendants to take all appropriate and meaningful measures to provide, at long last, the safe and adequate schools to which Plaintiffs and all Illinois children are entitled.' " 287 Ill. App. 3d at 825-26.

## DISCUSSION

### I. Justiciability

Plaintiffs contend that defendants are violating the first sentence of the second paragraph of section 1 of the education article of the Illinois Constitution: " 'The State shall provide for an efficient system of high quality public educational institutions and services.' " 186 Ill. 2d at 205, quoting Ill. Const. 1970, art. X, § 1 (hereafter the education system provision). Relying on *Committee for Educational Rights*, the majority concludes that "plaintiffs may not state a claim based upon violation of the education article of the Illinois Constitution." 186 Ill. 2d at 210. However, I agree with the appellate court that "the Illinois Constitution does indeed provide for at least a minimally adequate education and that those allegedly harmed by the lack of education, such as these plaintiffs,

may bring that cause of action in the circuit courts of Illinois." 287 Ill. App. 3d at 827.

In *Committee for Educational Rights*, I concluded as follows. Based on the plain language of the education article of the 1970 Illinois Constitution, the record of the 1970 Illinois Constitutional Convention, a comparison of the 1970 constitution to the 1870 constitution, and fundamental principles of constitutional law, "the education system provision is a constitutional directive to the three branches of state government to fulfill their duties in accordance with their traditional roles under separation of powers principles." *Committee for Educational Rights*, 174 Ill. 2d at 47 (Freeman, J., concurring in part and dissenting in part). "Since the education system provision is addressed to the entire state government, and since the judiciary is a coordinate branch of state government, I would hold that the education system provision is judicially enforceable." *Committee for Educational Rights*, 174 Ill. 2d at 52 (Freeman, J., concurring in part and dissenting in part).

Since the education system provision is judicially enforceable, it accordingly falls upon the judicial department of our state government to interpret it when properly raised. *Committee for Educational Rights*, 174 Ill. 2d at 53 (Freeman, J., concurring in part and dissenting in part). "The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Baker v. Carr*, 369 U.S. 186, 217, 7 L. Ed. 2d 663, 686, 82 S. Ct. 691, 710 (1962); see *Committee for Educational Rights*, 174 Ill. 2d at 54 (Freeman, J., concurring in part and dissenting in part). It is the function and duty of the supreme court—not the legislature—to act as the final arbiter of the Illinois Constitution. *People ex rel. Harrod v. Illinois Courts Comm'n*, 69 Ill. 2d 445, 458 (1977); accord 1 T. Cooley, Constitutional Limitations 104-07 (8th ed. 1927). I agree with Judge Cooley that "[t]he right and the power of the courts to do this are so plain, and

the duty is so generally—we almost say universally—conceded, that we should not be justified in wearying the patience of the reader in quoting from the very numerous authorities upon the subject." 1 T. Cooley, Constitutional Limitations 106-07 (8th ed. 1927).

Subsequent to *Committee for Educational Rights*, the Ohio Supreme Court was presented with this issue in *DeRolph v. State*, 78 Ohio St. 3d 193, 677 N.E.2d 733 (1997). Early in the opinion the court declared:

> "Under the long-standing doctrine of judicial review, it is our sworn duty to determine whether the General Assembly has enacted legislation that is constitutional. [Citation.] We are aware that the General Assembly has the responsibility to enact legislation and that such legislation is presumptively valid. [Citations.] However, this does not mean that we may turn a deaf ear to any challenge to laws passed by the General Assembly. The presumption that laws are constitutional is rebuttable. *Id.* The judiciary was created as part of a system of checks and balances. We will not dodge our responsibility by asserting that this case involves a nonjusticiable political question. To do so is unthinkable. We refuse to undermine our role as judicial arbiters and to pass our responsibilities onto the lap of the General Assembly." *DeRolph*, 78 Ohio St. 3d at 198, 677 N.E.2d at 737.

Regrettably, this is exactly what this court has done.

Further, I note the applicability of *People ex rel. Leighty v. Young*, 301 Ill. 67, 71 (1921), where this court reasoned: "[i]t cannot be said that a system which places the school house at a point so remote that the children of school age cannot reach it conveniently is either thorough or efficient." In this case, the majority rejects plaintiffs' argument that the quality of education in District 189 is so abysmal that schoolchildren are actually being deprived of access to an education. The majority reasons that "plaintiffs have not alleged in this case that schoolchildren are being denied access to schools. Rather, the plaintiffs complain about the quality of the

education that is being provided in those schools." 186 Ill. 2d at 210.

The majority apparently overlooks significant factual allegations in the complaint, a summary of which I earlier quoted. Plaintiffs allege that the physical condition of some District 189 schools, or portions thereof, are so dangerously abysmal that they are actually closed. 287 Ill. App. 3d at 825-26. Thus, schoolchildren are *physically* being denied access to an education within the reasoning of *Leighty*. I am troubled by the majority's view that District 189 schools are better than a vacant building marked with the word "School." 186 Ill. 2d at 210. I am at a loss as to what additional allegations the majority needs. Plaintiffs plead facts that are disgusting and shameful. Curiously, the majority doubts "that the legislature would ever set standards for education so as to allow for such a situation." 186 Ill. 2d at 210. However, the facts alleged here plainly show that "such a situation" exists.

## II. The Merits

The appellate court found that plaintiffs do not plead "sufficiently detailed facts stating the particular acts or omissions of defendants that have allegedly created the abhorrent conditions attributed to these schools. Without factual allegations alleging the specific wrongs of defendants, the complaint cannot allege a cause of action upon which relief can be granted." 287 Ill. App. 3d at 827. However, the appellate court went on to hold that plaintiffs *may* bring a cause of action under the education article (287 Ill. App. 3d at 827) and that sufficient facts *could* exist to state such a claim (287 Ill. App. 3d at 831).

I agree. I earlier explained why plaintiffs' complaint is legally sufficient. A complaint should not be dismissed for failure to state a claim unless it clearly appears that no set of facts could be proved under the allegations that

would entitle the party to relief. *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 473 (1990); *Ogle v. Fuiten*, 102 Ill. 2d 356, 360-61 (1984). At the least, plaintiffs could allege sufficient facts to state a cause of action for a declaratory judgment.

## CONCLUSION

In *Committee for Educational Rights*, I criticized the majority for abandoning its responsibility to interpret the Illinois Constitution. *Committee for Educational Rights*, 174 Ill. 2d at 62 (Freeman, J., concurring in part and dissenting in part). As a result of that decision, the judiciary became powerless to enforce the constitution, *i.e.*, to inquire "into whether the legislative and executive departments of our state government conform to the education system provision." *Committee for Educational Rights*, 174 Ill. 2d at 58 (Freeman, J., concurring in part and dissenting in part). In this case, the majority continues to turn the provision into a dead letter. See *De-Rolph*, 78 Ohio St. 3d at 263, 677 N.E.2d at 781 (Pfeifer, J., concurring).

I would hold that plaintiffs' claim is justiciable and that plaintiffs should be given an opportunity to amend their complaint. Accordingly, I dissent from part I of the majority opinion.

JUSTICE HARRISON joins in this partial concurrence and partial dissent.