FOURTH DIVISION

Filed: November 29, 2001 

No. 1-00-1119

1350 LAKE SHORE ASSOCIATES, an Illinois limited partnership, )  Appeal from the

)  Circuit Court of

Plaintiff-Appellant, )  Cook County.

)

v. )

)

CHRISTOPHER R. HILL, Commissioner, Department of Planning and )

Development of the City of Chicago, and CITY OF CHICAGO, an ) 

Illinois municipal corporation, )

)

Defendants-Appellees, )

)

and )

)

EDWARD T. JOYCE, CARL HUNTER, JOHN STASSEN, )

JOHN C. MULLEN, CLARK W. FETRIDGE, RESPICIO )

F. VASQUEZ, and BERNARD J. MILLER, )  Honorable

)  Julia M. Nowicki

Intervenors-Appellees. )  Judge Presiding.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

The plaintiff, 1350 Lake Shore Associates (LSA), appeals from a circuit court order, entered following a bench trial, denying its petition for a writ of 
mandamus
 directing the defendant, Christopher R. Hill, Commissioner of the Department of Planning and Development of the City of Chicago (Commissioner), to issue it a Part II Approval letter, a necessary prerequisite to the issuance of a building permit for construction within a residential planned development.  For the reasons which follow, we reverse.

At all times relevant to this appeal, LSA has owned the property located at 1320-30 Lake Shore Drive in Chicago, Illinois (the property).  On April 5, 1978, LSA, through its agent Draper and Kramer, Inc., (Draper), filed an application to amend the property's zoning from "R8 General Residence" to a residential planned development which would permit the construction of a high-rise apartment building.  On November 14, 1978, the Chicago City Council approved the requested amendment and established "Residential Planned Development 196" (RPD 196), permitting construction of a 40-story, 196-unit apartment building on the property.

After having secured the passage of RPD 196 in 1978,  LSA chose not to develop the property at that time.  Sometime in 1996, LSA, again through its agent Draper, began investigating the possibility of developing the property in conformity with RPD 196.  It ultimately decided to go forward with the project.  Draper hired an attorney, Jack Guthman, to represent it in connection with the project, hired an architect to draw up plans, and took other steps toward development.
(footnote: 1)  The plan to construct a high-rise apartment building, however, met with community opposition.  On December 10, 1997, Charles Bernardini, then alderman of Chicago's 43
rd
 Ward, the ward in which the property is located, introduced an ordinance (hereinafter referred to as the down-zoning ordinance) proposing to change the property's zoning from RPD 196 to "R6 General Residence District," under which the proposed building would not be a permitted use.

On December 11, 1997, the day after Alderman Bernardini introduced the down-zoning ordinance, the project architect submitted plans (Part II Submittal) to the Department of Planning and Development of the City of Chicago (Department of Planning), seeking the issuance of a Part II Approval letter. Prior to trial, the parties stipulated that "[u]nder the City's policies and procedures, a Part II Submittal is a necessary precondition to the issuance of a Part II Approval Letter" and that "[u]nder those same policies and procedures, Plaintiff cannot obtain a building permit without receiving a Part II Approval Letter."  Although the parties have not provided us with a citation to or copy of any "policies and procedures" which use the terminology Part II Submittal and Part II Approval, it appears that the Part II process is undertaken pursuant to Article 11 of the Chicago Zoning Ordinance (Zoning Ordinance), which sets forth the procedures and substantive standards with respect to, 
inter
 
alia
, the issuance of zoning certificates.  Section 11.5 of the Zoning Ordinance, entitled Zoning Certificates, provides, in relevant part, that

"no permit pertaining to the use of land or buildings shall be issued by any officer, department, or employee of this City unless the application for such permit has been examined by the Office of the Zoning Administrator and has affixed to it a certificate of the Office of the Zoning Administrator that the proposed building or structure complies with all the provisions of this comprehensive amendment." Chicago Zoning Ordinance §11.5 (amended 7-21-99).

The Part II process of review by the Commissioner of the Department of Planning is apparently conducted pursuant to section 11.11-3(b) of the Zoning Ordinance, which provides, in relevant part, as follows:

"After the adoption of a planned development ordinance, every application for a permit or license within the planned development boundaries shall be reviewed by the Commissioner of Planning and Development for a determination that the proposed use, building or structure complies with all provisions of the planned development ordinance.  Zoning and occupancy certificates shall be issued by the Zoning Administrator for uses, buildings or structures within the planned development only upon receipt of written approval by the Commissioner of Planning and Development."  Chicago Zoning Ordinance §11.11-3(b) (amended 12-11-91).

Accordingly, it appears that a Part II Approval from the Commissioner is a prerequisite to the issuance of a zoning certificate, which is, in turn, a prerequisite to the issuance of a building permit.

As stated, the project architect submitted the plans to the Department of Planning on December 11, 1997.  The Commissioner, however, took no action.  On February 13, 1998, Guthman, the attorney Draper hired for the project, wrote to assistant commissioner Phil Levin, requesting a response to the Part II Submittal.  On March 4, 1998, an associate of Guthman's wrote to Levin requesting that the Part II Approval letter be issued.  Guthman made yet another such written request dated April 16, 1998.  On April 29, 1998, the Chicago City Council approved the down-zoning ordinance, which became effective on May 20, 1998.  When this case proceeded to trial in January 2000, the Commissioner had still not responded to the Part II Submittal.

LSA filed its initial complaint in the instant matter, docketed as number 98 CH 11371, on August 25, 1998, naming as defendants the Commissioner and the City of Chicago (hereinafter referred to collectively as the City defendants).  The City defendants moved to dismiss LSA's complaint, arguing, in part, that LSA failed to give neighboring property owners notice, as required by section 11-13-8 of the Illinois Municipal Code (65 ILCS 5/11-13-8 (West 1998)), of those counts of the complaint in which it sought a declaration that the down-zoning ordinance is invalid.  Subsequently, on January 15, 1999, LSA filed a separate but substantially similar complaint, docketed as number 99 CH 00674, to which it attached a certificate of compliance with the relevant notice requirement.  The trial court granted LSA's motion to consolidate the two cases and denied the City defendants' pending motion to dismiss.  Edward T. Joyce, Carl Hunter, John Stassen, John C. Mullen, Clark W. Fetridge, Respicio F. Vasquez, and Bernard J. Miller (hereinafter referred to collectively as the intervenors), all of whom owned property located within 250 feet of LSA's property and had received notice of the filing of the second complaint, filed their appearances in the consolidated action.
(footnote: 2)
 On April 19, 1999, LSA filed a three count first amended complaint in the consolidated action. Count I sought a writ of 
mandamus
 directing the Commissioner to issue LSA a Part II Approval letter.  Count II sought a declaration that the down-zoning ordinance does not affect LSA's right to develop the property in conformity with RPD 196 and an injunction barring the City from enforcing the down-zoning ordinance against it.  Count III sought a declaration that the down-zoning ordinance is void.  Although the statutory provision pursuant to which the intervenors had been served notice did not require that they be given notice of LSA's count seeking a writ of 
mandamus
 (see 65 ILCS 5/11-13-8 (West 1998)), the trial court later granted the intervenors leave to intervene as to that count.

In its first amended complaint, LSA alleged, 
inter
 
alia
 that "RPD 196 established legally binding development rights for the plaintiff for a period of twenty (20) years" and that the proposed building to be constructed on the property complies with RPD 196.  Both the City defendants and the intervenors denied LSA's allegation that RPD 196 established legally binding rights for a period of 20 years.  The City defendants admitted LSA's allegation that the proposed building complies with RPD 196, but the intervenors stated that they lacked sufficient knowledge or information to form a belief as to the truth or falsity of that allegation.   On appeal, both the City defendants and the intervenors continue to argue that LSA's rights under RPD 196 did not last for 20 years.  All parties, however, have agreed that the proposed plans submitted to the Commissioner comply fully with the requirements of RPD 196.

On June 21, 1999, LSA filed a motion for summary judgment on count I of its first amended complaint
, arguing that it had obtained a vested right to the issuance of the Part II Approval letter pursuant to RPD 196 and, thus, was entitled to the approval despite the change in the property's zoning.  In support of its position, LSA relied upon the proposition that a landowner who substantially changes his position in good faith reliance upon the probability that a building permit will issue has a vested right to that permit despite any subsequent change in zoning (see 
People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove
, 16 Ill. 2d 183, 157 N.E.2d 33 (1959)).  LSA argued that this rule applies equally with regard to a Part II Approval letter, as it is a prerequisite to the issuance of a building permit.  In their respective responses to LSA's motion for summary judgment, the City defendants and the intervenors argued that LSA no longer had the right to develop the property in conformity with RPD 196 because it had not undertaken such development contemporaneously with the passage of that ordinance.  They further argued that LSA's expenditures on the project were neither substantial nor made in good faith reliance on the issuance of a Part II Approval letter.

By way of written order dated August 10, 1999, the trial court denied LSA's motion for summary judgment on count I, finding that questions of fact existed "concerning the plaintiff's good faith reliance particularly with respect to the point in time at which the plaintiff was put on notice of the proposed re-zoning and in turn whether the plaintiff's reliance on continuation of the prior zoning in its case was justified."  The trial court also granted LSA's motion to voluntarily dismiss count II of its first amended complaint.

Commencing on January 18, 2000, the court conducted a bench trial on count I of LSA's first amended complaint.  At trial, LSA presented evidence in support of its theory that it had expended sufficient sums of money on the project in good faith reliance on the issuance of the Part II Approval to obtain a vested right to that approval.  The City defendants and the intervenors presented evidence in support of their theory that Draper, and thus LSA, was aware very early on that it could not reasonably rely on the issuance of a Part II Approval letter pursuant to RPD 196.  This included evidence that Draper was aware of community opposition to high-rises in general and to LSA's proposed building in particular and that Alderman Bernardini had informed Guthman of his intent to down-zone the property if Draper did not reach an agreement with the community.  For reasons which will become apparent, we find it unnecessary to set forth in any greater detail the substance of the evidence presented.

On March 9, 2000, following trial, the court issued a written memorandum of opinion in which it found that "from the very commencement of this project in 1996," LSA could not reasonably rely on the probability that it would obtain a Part II Approval and entered judgment in favor of the City defendants and the intervenors.  On March 27, 2000, the trial court made a finding that there was no just reason to delay enforcement or appeal of its March 9, 2000, order.  Two days later, LSA initiated the instant appeal pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)).

On appeal, although seemingly raising six issues, LSA actually makes only one argument, namely that the trial court's denial of a writ of 
mandamus
 was an abuse of discretion because the finding that LSA could not have reasonably relied upon the issuance of a Part II Approval letter is against the manifest weight of the evidence
.  The City defendants and the intervenors assert that the trial court's factual finding on the reliance issue is amply supported by the evidence and that its decision that LSA is not entitled to a writ of 
mandamus
 also can be affirmed on the alternative basis that RPD 196 had expired prior to the date on which the Part II Submittal was filed.

Mandamus
 is an extraordinary remedy which is used to enforce " 'the performance of official duties by a public officer where no exercise of discretion on his part is involved.' " 
Noyola v. Board of Education of the City of Chicago
, 179 Ill. 2d 121, 133, 688 N.E.2d 81 (1997), quoting 
Madden v. Cronson
, 114 Ill. 2d 504, 514, 501 N.E.2d 1267 (1986).  It is not a writ of right but is awarded as a matter of judicial discretion.  
League of Women Voters v. County of Peoria
, 121 Ill. 2d 236, 242, 520 N.E.2d 626 (1987).  The party seeking a writ of 
mandamus
 bears the burden of establishing an absolute right to its issuance.  
Romero v. O'Sullivan
, 302 Ill. App. 3d 1031, 1034, 707 N.E.2d 986 (1999).  The issuance of a writ of 
mandamus
 is appropriate only where the plaintiff shows a clear, affirmative right to the requested relief, a clear duty to act on the defendant's part, and clear authority in the defendant to comply with the writ.  
Lewis E. v. Spagnolo
, 186 Ill. 2d 198, 229, 710 N.E.2d 798 (1999).  A reviewing court will not disturb the trial court's ruling on a petition for the issuance of a writ of 
mandamus
 unless its findings of fact are against the manifest weight of the evidence (
Taylor v. Wentz
, 15 Ill. 2d 83, 91, 153 N.E.2d 812 (1958)) or the trial court abuses its discretion or applies an impermissible legal criterion (
Durbin v. Gilmore
, 307 Ill. App. 3d 337, 339, 718 N.E.2d 292 (1999)).  With these principles in mind, we must now consider the propriety of the trial court's ruling.

As the party seeking a writ of 
mandamus
, LSA had the burden of establishing three things: 1) that it has a clear right to the issuance of a Part II Approval letter; 2) that the Commissioner has a clear duty to issue the Part II Approval letter; and 3) that the Commissioner has the clear authority to issue the Part II Approval letter should he be ordered to do so.  
Lewis E.
, 186 Ill. 2d at 229.  Pursuant to the provisions of the Zoning Ordinance, the Commissioner has both the duty and the authority to issue a Part II Approval letter when the plans submitted to him comply with all provisions of the relevant planned development ordinance.  See Chicago Zoning Ordinance §11.11-3(b)(amended 12-11-91).  We focus our analysis, therefore, on the issue of whether LSA has established that it has a clear right to the issuance of the Part II Approval letter.

As stated above, the parties have not provided us with any rules governing the Part II process.  Section 11.11-3(b) of the Zoning Ordinance, however, provides that "every application for a permit or license within the planned development boundaries shall be reviewed by the Commissioner of Planning and Development for a determination that the proposed use, building or structure complies with all provisions of the planned development ordinance."  Chicago Zoning Ordinance §11.11-3(b) (amended 12-11-91).  Accordingly, a landowner is entitled to the issuance of a Part II Approval letter when his property is located within a planned development and the plans he submits meet all requirements of the applicable planned development ordinance.   All parties agree that the plans submitted to the Department of Planning on December 11, 1997, comply fully with the requirements of RPD 196.  The City defendants and the intervenors, however, argue that, on the date the Part II Submittal was filed, the property was not located in a planned development because RPD 196 had already expired.  We disagree.

The City defendants and the intervenors base their argument regarding the expiration of RPD 196 on section 11.11-1 of the Zoning Ordinance which, at the relevant time, provided, in part, as follows:

"Such land or air rights proposed to be developed [as a planned development] may consist of one or more lots to be developed as a unit, whether contemporaneously or within a proposed extended period of time commensurate with the character of the proposal but in no event to exceed 20 years, and may include one or more principal buildings and accessory buildings, principal uses and accessory uses; provided, however, that such land or air rights must also be under single ownership or control or under single designated control."  Chicago Zoning Ordinance §11.11-1 (1978).
(footnote: 3)
The City defendants and intervenors contend that section 11.11-1 did not provide an automatic 20-year expiration period for planned development ordinances.  Rather, they contend, the language of section 11.11-1 should be interpreted as stating that a planned development ordinance expires if a landowner does not develop its property "contemporaneously" with the approval of the planned development ordinance governing the property or seek an extension of time to develop the property, which in no event can exceed 20 years from the date of the ordinance's passage.

The construction of an ordinance is a question of law
 (
North Avenue Properties, L.L.C., v. Zoning Board of Appeals of the City of Chicago
, 312 Ill. App. 3d 182, 185, 726 N.E.2d 65 (2000)), governed by the rules of statutory construction (
In re Application of County Collector of Kane County
, 132 Ill. 2d 64, 72, 547 N.E.2d 107 (1989)).  The primary rule of construction is to give effect to the intent of the legislative body, and the inquiry into legislative intent begins with the language of the statute or ordinance.  
In re B.C.
, 176 Ill. 2d 536, 542, 680 N.E.2d 1355 (1997).  Based on the language of the ordinance at issue, we cannot agree with the interpretation proposed by the City defendants and the intervenors.  Section 11.11-1 of the Zoning Ordinance simply does not state that a planned development ordinance expires upon a property owner's failure to timely develop the property governed by the ordinance in question.  Significantly, the down-zoning ordinance introduced by Alderman Bernardini and approved by the Chicago City Council on April 29, 1998, changed the property's zoning from RPD 196 to R6, a further indication that RPD 196 was still in effect.  As such, we reject the argument that RPD 196 had expired prior to the December 11, 1997, filing of the Part II Submittal.

The City defendants and the intervenors also argue that LSA is not entitled to a Part II Approval letter because, on the date the Part II Submittal was filed, the down-zoning ordinance was pending.  They argue that the Commissioner was entitled to delay his decision on the Part II Submittal until the outcome of the pending down-zoning ordinance was known and, since that ordinance was ultimately enacted, they contend that the Commissioner is not required to issue the approval.  In support of this argument, the City defendants and the intervenors rely on 
Chicago Title & Trust Co. v. Village of Palatine
, 22 Ill. App. 2d 264, 268, 160 N.E.2d 697 (1959), where this court held that "while the municipal authority has no right to arbitrarily or unreasonably refuse or delay the issuance of the [building] permit, the issuance may be delayed when there is under consideration or pending an ordinance under which the issuance of the permit would be prohibited."  Although this
 rule pertains to building permits, the City defendants and the intervenors argue that it applies with equal force to allow the Commissioner to delay issuing a Part II Approval letter.  In response, LSA argues that  it had already obtained a vested right to the approval and could not be deprived of this right even upon passage of the down-zoning ordinance.  For this reason, it maintains, the Commissioner was not entitled to delay issuing the Part II Approval letter on the basis of the pending down-zoning ordinance.  As stated above, LSA relies upon the principle that a landowner that substantially changes its position through expenditures or the incurrence of obligations in good faith reliance on the issuance of a building permit obtains a vested right to the issuance of the permit, a right which is unaffected by a subsequent change in zoning.  See 
Deer Park Civic Ass'n v. City of Chicago
, 347 Ill. App. 3d 346, 106 N.E.2d 823 (1952); 
People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove
, 16 Ill. 2d 183, 191, 157 N.E.2d 33 (1959).  This rule has been applied only with respect to building permits and, in conjunction therewith, zoning certificates (see 
Pioneer Trust & Savings Bank v. County of Cook
, 71 Ill. 2d 510, 377 N.E.2d 21 (1978); 
People ex rel. National Bank of Austin v. County of Cook
, 56 Ill. App. 2d 436, 206 N.E.2d 441 (1965)).  LSA, nonetheless, argues that it applies with equal force to the issuance of Part II Approval letters.  The trial court apparently agreed with the parties that, with respect to the aforementioned principles of law, the distinction between a building permit and a Part II Approval letter is one without difference.  In determining that LSA was not entitled to a writ of 
mandamus
, the court implicitly held that the Commissioner was entitled to await the outcome of the pending down-zoning ordinance before making a determination with respect to the Part II Submittal.

We cannot, however, agree with the trial court that the rules of law upon which the parties have relied, pertaining to the issuance of building permits and zoning certificates, apply to the issuance of a Part II Approval letter.   Section 11.11-3(b) of the Zoning Ordinance requires the Commissioner to make a determination only as to whether the plans in question comply with the planned development ordinance.  It is the building commissioner and the Office of the Zoning Administrator, not the Commissioner of the Department of Planning, that warrant that a proposed use complies with all provisions of the Zoning Ordinance.  Chicago Municipal Code §13-32-040 (1998);  Chicago Zoning Ordinance §11-5 (amended 7-21-99).  A Part II Approval letter neither warrants such compliance nor authorizes a property owner to commence construction.  In fact, although a property owner cannot obtain either a zoning certificate or a building permit without first obtaining a Part II Approval letter, there is nothing in the Zoning Ordinance which guarantees that a property owner who obtains a Part II Approval letter will necessarily obtain either a zoning certificate or a building permit.  As of December 11, 1997, the Commissioner's only function was to determine: 1) whether the property was located within the boundaries of a planned development; and 2) whether the plans submitted complied with the requirements of the governing planned development ordinance.   For this reason,  we find that the Commissioner was not entitled to await the outcome of the down-zoning ordinance before making a determination as to LSA's entitlement to a Part II Approval letter.

On December 11, 1997, the date on which the Part II Submittal was filed, RPD 196 was in effect and the proposed plans complied fully with the provisions of that ordinance.  Thus, LSA has established a clear right to the issuance of a Part II Approval letter.  Further, it is clear that the Commissioner has both the duty and the authority to issue a Part II Approval letter when the plans submitted to him comply fully with the relevant planned development ordinance.  Accordingly, we conclude that the trial court erred in denying LSA's petition for a writ of 
mandamus
.

In closing, we wish to make clear that we are expressing no opinion as to whether LSA is entitled to either a zoning certificate or a building permit.

For the foregoing reasons, we reverse the circuit court's order entering judgment in favor of the City defendants and the intervenors on count I of LSA's first amended complaint and remand the case to the circuit court with directions that it issue a writ of 
mandamus
 requiring the Commissioner to issue a Part II Approval letter to LSA, certifying that its Part II Submittal complies with the provisions of RPD 196.

Reversed and remanded with directions.

HARTMAN and THEIS, JJ., concur.

FOOTNOTES
1: 
At trial, the parties disputed whether Draper was acting on LSA's behalf in taking the actions and incurring the expenditures at issue.  The trial court concluded that the expenditures in question were the responsibility of LSA.

2: 
James G. Hunter also filed an appearance, but the trial court later granted his motion to be dismissed as an intervenor.

3:  On March 11, 1998, the Chicago City Council amended section 11.11-1 by deleting, in relevant part, the word "extended" and the phrase "but in no event to exceed 20 years."  See Chicago Zoning Ordinance §11.11-1 (amended 3-11-98).  On that same date, the Council added to the Zoning Ordinance section 11.11-4, which provides that a planned development ordinance terminates six years from the date of its approval unless construction has commenced by that date and is thereafter diligently pursued.  Chicago Zoning Ordinance §11.11-4 (added 3-11-98).