SIXTH DIVISION
August 15, 2008

No. 1-06-1671

| | | |
|---|---|---|
| ANTHONY CRIBBIN, PETER | ) | Appeal from the |
| KOULOGEORGE, and DONNA | ) | Circuit Court of |
| KOULOGEORGE, | ) | Cook County, Illinois. |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | No. 04 CH 07217 |
| | ) | |
| THE CITY OF CHICAGO, RICHARD | ) | |
| RODRIGUEZ, Executive Director, City of | ) | |
| Chicago Department of Construction and | ) | Honorable |
| Permits, and UNKNOWN OTHERS, | ) | Thomas P. Quinn |
| | ) | Judge Presiding. |
| Defendants-Appellants. | ) | |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Land developers Anthony Cribbin and Peter Koulogeorge purchased property in Chicago with the intent of constructing apartment buildings on the property and then selling it at a profit. After they had owned the property for several years and incurred various expenditures in pursuit of their plans, the City of Chicago (City) rezoned the property, such that the planned construction was no longer allowed. Cribbin and Peter Koulogeorge then filed an action against the City, seeking a ruling that as a result of their past expenditures, they had acquired vested rights to the previous zoning classification and should be issued building permits based on that previous classification. Following a bench trial, the trial court entered judgment for Cribbin and Peter Koulogeorge and ordered the City to issue the requested permits. The City now appeals. For the reasons that follow, we affirm.

I. BACKGROUND

No. 1-06-1671

On April 30, 2004, Cribbin, Peter Koulogeorge, and his wife Donna Koulogeorge (collectively referred to as plaintiffs) filed their complaint in the circuit court, in which they alleged the following: In 1998, Cribbin and Peter Koulogeorge were co-owners of a real estate development company known as Crystal Creek Development, Ltd. (Crystal Creek). Crystal Creek purchased a parcel of real property located at 1210-20 N. Kedzie in Chicago, Illinois (the Kedzie property), for $260,000. At the time, the property was zoned as an R5 general residence district; Cribbin and Peter Koulogeorge allegedly intended to develop residential units on the property, and accordingly, they drew up plans to construct two 14-unit buildings there.

The complaint further avers that, in 1999, the Chicago Board of Education (CBE) advised Crystal Creek that it passed a resolution designating the Kedzie property for acquisition under its power of eminent domain, because it needed to use the land to relieve overcrowding at a nearby elementary school. To keep them from doing so, Crystal Creek allegedly agreed to lease the Kedzie property to the CBE for three years. Subsequently, in 2002, the CBE had not resolved its overcrowding issue and therefore negotiated a one-year extension of the lease with Crystal Creek. During this four-year period, Crystal Creek's plans for development were placed on hold. Also during this period, the property was rezoned to an R4 general residence district which roughly halved the number of units that could be constructed on the property.

The complaint then alleges that the CBE's lease ended in 2003, and the CBE vacated the premises. In that same year, Cribbin and Peter Koulogeorge dissolved Crystal Creek and divided the property equally between them.

Both Cribbin and Peter Koulogeorge allegedly proceeded with their plans to develop

-2-

multiunit residential housing on their respective halves of the property. Cribbin hired the architectural firm of Fajardo & Fajardo, Ltd., to draw up building plans and prepare documentation for submission to the City. He alleges that he spent a total of $18,000 on architectural and engineering fees for the development plans and $4,000 in connection with permit process fees and expenses. Meanwhile, Peter Koulogeorge retained the architectural firm of John Hanna to draw up building plans and prepare documentation. He alleges that he spent $10,000 on architectural and engineering fees plus "several hundred" dollars on permit process fees and expenses. The complaint avers that both of them expended this money in good-faith reliance on the probable issuance of construction permits for the property.

The complaint states that plaintiffs' construction permit applications were nevertheless denied by the City: the alderman of the 26th Ward, William Ocasio, placed a hold on their applications. Additionally, in March 2003, Alderman Ocasio introduced a proposal that the area containing the Kedzie property be downzoned to an R3 general residence district, under which the planned construction could not proceed.

Thus, plaintiffs request that writs of *mandamus* be issued requiring the City to release any hold on construction permits for the Kedzie property and to issue the requested permits *instanter*. They also request a declaration that they are lawfully entitled to the issuance of constructed permits for the Cribbin and Koulogeorge properties. Finally, they seek an award of damages, costs, and attorney fees incurred as a result of the City's refusal to issue the construction permits.

In its answer, by way of affirmative defense, the City avers that at the time when plaintiffs applied for their permits, there was a proposed amendment before the city council

which, if passed, would prohibit issuance of those permits. Subsequently, that amendment was passed. Thus, the City states that it was within its rights in refusing to issue the permits.

The City then filed a motion to dismiss, in which it states that on September 4, 2003, Alderman Ocasio introduced an ordinance in the city council of Chicago that would change the classification of the Kedzie property from R4 to R3. This ordinance was passed on May 5, 2004. Plaintiffs' multiunit building plans did not conform to R3 zoning requirements, which mandate a minimum of 1,500 to 2,500 square feet of lot area per dwelling space (as opposed to R4 zoning, which only mandates 1,000 square feet per dwelling space).

The City also alleges that Cribbin did not apply for building permits for his half of the property until October 22, 2003, while Peter Koulogeorge did not apply for permits until October 30, 2003, *i.e.*, after the zoning change had been officially proposed. The City argues that it had the power to refrain from issuing permits to plaintiffs while the proposed ordinance was pending passage, and once the ordinance had passed, plaintiffs had no right to be issued permits. It therefore requests that plaintiffs' case be dismissed in its entirety.

In their response to the City's motion to dismiss, plaintiffs argue that under Illinois law, because of the substantial expenditures plaintiffs had made in good-faith reliance on the previous zoning classification, they acquired vested rights in that zoning classification; thus, plaintiffs contend that they are entitled to have building permits issue as if the property were still classified as an R4 district.

The court denied the City's motion to dismiss, agreeing with plaintiffs' interpretation of the law. It noted that plaintiffs had alleged that together they spent $260,000 on purchasing the

property and a total of $32,000 on architectural fees, engineering fees, and other permit-related expenses. It also noted that plaintiffs alleged they were unaware of any possible change to the R4 zoning. As a result, it concluded that under the legal standard plaintiffs had articulated, their complaint was sufficient to survive a motion to dismiss.

The case proceeded to a bench trial. Peter Koulogeorge testified that he was a full-time real estate developer involved in purchasing land, constructing residential buildings on it, and then reselling it at a profit. He testified that aside from the Kedzie project, he had been a part of 23 other real estate development projects in Chicago, all of which were small residential projects.

Peter Koulogeorge also testified that he and Cribbin formed Crystal Creek in 1996 for purposes of acquiring real estate to develop. Crystal Creek identified the Kedzie property, which at the time was a vacant lot, as suitable property to develop into multiunit condominiums, and it bought the property for $260,000. To finance this purchase, the corporation had to take out a loan for $195,000, which Cribbin and Peter Koulogeorge personally guaranteed.

Peter Koulogeorge stated that in making this purchase, he and Cribbin were relying on the existing R5 zoning; he also stated that R4 zoning would have been suitable for development, as most of their past projects had been done on R4 land. Thus, when the land was rezoned to R4 in summer of 2001, it was a setback, but not fatal to their plans: it still allowed enough latitude for them to construct profitable multiunit dwellings.

According to Peter Koulogeorge, around June 30, 1999, he and Cribbin received a letter from counsel from the CBE threatening to take the Kedzie property through its power of eminent domain to relieve overcrowding at a nearby elementary school. The CBE informally suggested

purchasing the land for $300,000, but plaintiffs were adamantly opposed to this suggestion: "We had no intention of selling the property," Peter Koulogeorge stated. "It wasn't for sale. It was to be developed." Instead, he and Cribbin negotiated a lease with the CBE that would allow them to retain ownership of the property. After signing the lease, he and Cribbin continued meeting with an architect he had retained from the firm of Fajardo & Fajardo to finish building plans; he testified that he had hoped to complete his plans for development before the CBE's lease had ended.

Peter Koulogeorge then said that, in 2002, the CBE asked to extend the lease for two years. The CBE's threat of eminent domain was still present, he said. Nevertheless, Peter Koulogeorge told the CBE that a two-year lease was out of the question because of their development plans, and he was able to negotiate a one-year extension of the lease, with the understanding that the CBE would vacate the premises once the extension was over.

In the summer of 2003, shortly after the CBE's lease had ended, Cribbin and Peter Koulogeorge decided to dissolve Crystal Creek. Peter Koulogeorge testified that the Kedzie property was Crystal Creek's only project in progress at the time. Thus, the two partners made a handshake agreement to split the property: Cribbin took the north half, while Peter Koulogeorge took the south half. Title to his half of the property was officially conveyed to Peter Koulogeorge in December 2003.

Peter Koulogeorge further testified that he took steps to develop his half of the property under the then-existing R4 zoning. He paid $250 for a survey of the land in preparation for the permit application. He intended to build one six-unit building, with a projected cost of

$600,000; when completed, he calculated that each unit would sell for roughly $300,000, for a gross of $2 million. He testified that his plans were totally compliant with R4 zoning. Nevertheless, when he applied for a construction permit, it was not issued, and he was informed that Alderman Ocasio had put a hold on the issuance of the requested permit due to a proposed change to R3 zoning. Peter Koulogeorge attended a zoning committee meeting to discuss the proposal: he voiced his objections, explaining his development plans and the obstacles he had encountered along the way due to the CBE's overcrowding problems.

Cribbin also testified regarding the planned development of the Kedzie property. He affirmed Peter Koulogeorge's testimony regarding the formation of Crystal Creek and the purchase of the Kedzie property. "We purchased it to develop within a reasonable amount of time," he stated, elaborating that it was their usual practice to begin developing property within three to six months of purchase. He also stated that they acted in reliance on the existing R5 zoning.

Cribbin further testified that, around the time that they purchased the Kedzie property, they had other opportunities for real estate development; in fact, he said, they were "constantly being approached by realtors to purchase property." However, the purchase of the Kedzie property left them with no capital, so they had to turn down all such offers for the following year.

Cribbin agreed with Peter Koulogeorge's testimony regarding the lease of the property to the CBE, particularly the rationale behind leasing the property instead of selling it: "We wanted to build on it," he said. "That was our adamant decision from day one."

Cribbin also agreed with Peter Koulogeorge's testimony regarding the dissolution of

Crystal Creek. Immediately after the property was split, Cribbin called an architect to draw up plans for developing his half of the property. He planned to construct two residential buildings, one with three units, the other with four; he calculated that the buildings would cost approximately $150,000 and $200,000 to build, respectively, and that each of the seven completed units would sell for approximately $200,000.

On May 16, 2006, the trial court entered judgment for plaintiffs on the *mandamus* claims, and it ordered the City to issue them permits based on R4 zoning. In support of its ruling, the court issued the following findings:

"1) The plaintiffs purchased the subject property with the sole intention of developing under the then existing zoning;

2) Plaintiffs would not have purchased the subject property had they suspected it would be down zoned to R-3;

3) The plaintiffs never wavered in their intent and desire to develop the subject property;

4) The plaintiffs took actions and made substantial expenditures within a reasonable time after acquiring the subject property;

5) The purchase price of the subject property should be considered as a part of plaintiff's expenditures in reliance on existing zoning, See *Furniture LLC v. City of Chicago, 353 Ill. App. 3d 433 (2004)*;

6) Even if the purchase price were not considered, plaintiffs made the requisite substantial expenditures in order to create a vested right in the R-4 zoning;

7) Any delay in development caused by the leases with the Chicago Board of Education should not be counted against the plaintiffs because they did everything in their power to salvage the development despite the Board's interference with their plans;

8) Under the totality of circumstances in this case, it is difficult to imagine what further efforts at development could have been undertaken by the plaintiffs."

The trial court's order did not reference plaintiffs' declaratory judgment count or their request for damages, attorney fees, and costs.

The City timely filed the instant appeal.

II.  ANALYSIS

Before we proceed to the substance of this case, we must first determine whether we have jurisdiction to hear this matter despite the fact that the trial court order being appealed from does not explicitly dispense with plaintiffs' claims for declaratory judgment, damages, attorney fees, and costs.  The City contends that the order is nonetheless final and appealable under Supreme Court Rule 303 (134 Ill. 2d R. 303).  With respect to plaintiffs' claims for declaratory judgment, it argues that those have been adjudicated in substance, because the ultimate rights of the parties have been determined by the court's order; furthermore, it argues that plaintiffs have abandoned their claims for damages, attorney fees, and costs, and it contends that such abandoned claims do not defeat appellate jurisdiction.

Plaintiffs do not challenge the City's contentions regarding jurisdiction in their brief. Nevertheless, it is necessary for us to consider this issue, because any decision rendered beyond a court's jurisdiction is void (*Davis v. Haas & Haas, Inc.*, 296 Ill. App. 3d 369, 373, 694 N.E.2d

588, 590 (1998)), and the issue of jurisdiction may not be waived (*Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 334, 770 N.E.2d 177, 184 (2002)).

Jurisdiction of the appellate courts is limited to reviewing appeals from final judgments, except where statutory or supreme court exceptions apply. *In re Marriage of Verdung*, 126 Ill. 2d 542, 553, 535 N.E.2d 818, 823 (1989). A judgment is final when it "terminate[s] the litigation between the parties on the merits of the cause." *People ex rel. Madison Chemical Corp. v. Gurrie*, 52 Ill. App. 2d 360, 363, 202 N.E.2d 123, 125 (1964); see *People ex rel. Scott v. Silverstein*, 87 Ill. 2d 167, 171, 429 N.E.2d 483, 485 (1981). Furthermore, for a decision to be appealable directly under Supreme Court Rule 303 (134 Ill. 2d R. 303), it must dispose of all pending issues and parties. *F.H. Prince & Co. v. Towers Financial Corp.*, 266 Ill. App. 3d 977, 982, 640 N.E.2d 1313, 1316 (1994). Otherwise, with limited exceptions as provided by Supreme Court Rules 304(b) and 307, we cannot acquire subject matter jurisdiction over the matter unless the trial court has made a special finding under Supreme Court Rule 304(a) that there is no just reason for delaying enforcement or appeal of the adjudicated portion of the controversy. 134 Ill. 2d R. 304, 307; *F.H. Prince*, 266 Ill. App. 3d at 982-83, 640 N.E.2d at 1316.

We agree with the City that our jurisdiction is not defeated by the fact that the trial court's order does not formally dispose of plaintiffs' request for declaratory judgment. When the relief sought under different counts is identical, and disposition of the one necessarily entails disposal of the other, then the grant of relief under one count will be deemed, for purposes of appeal, to constitute a resolution of the other count as well. *Grissom v. Buckley-Loda Community Unit School District No. 8*, 11 Ill. App. 3d 55, 296 N.E.2d 624 (1973) (finding that a

trial court order was final and appealable when counts I and II of plaintiff's complaint both requested that a writ of *mandamus* be issued and the trial court granted relief under count I); see *Lynch Imports, Ltd. v. Frey*, 200 Ill. App. 3d 781, 785, 558 N.E.2d 484, 486-87 (1990) (defendants' counterclaim was predicated upon the same grounds as their defense to plaintiff's complaint; thus, summary judgment in favor of plaintiff upon its complaint also served to dispose of defendants' counterclaim, rendering case final for purposes of appeal). In the instant case, plaintiffs' claims for *mandamus* and declaratory judgment are both predicated upon the same theory – namely, that they acquired vested rights to construction permits by virtue of their expenditures on reliance on the preexisting zoning classification – so, for purposes of appeal, the resolution of the former obviates the necessity of a formal resolution of the latter.

Nor do plaintiffs' requests for damages, attorney fees, and costs serve to defeat our jurisdiction here, as they have been abandoned by plaintiffs and are no longer open for adjudication by the trial court. Plaintiffs did not present evidence in support of such relief at trial, and they did not ask the trial court to reserve jurisdiction with respect to these matters after the trial court issued its May 16, 2006, order from which the instant appeal is taken. Moreover, plaintiffs in their brief do not challenge the City's contention that they have abandoned these claims, and their prayer for relief before this court makes no mention of these claims. When a party abandons a claim, and the trial court does not retain jurisdiction to consider that claim when it enters judgment, that judgment may be considered final even if the abandoned claim is not explicitly mentioned in the judgment order. *Madison Chemical Corp.*, 52 Ill. App. 2d at 363-64, 202 N.E.2d at 125. In *Madison Chemical Corp.*, the court held that even though the

judgment order in that case did not mention plaintiff's claims for interest, costs, and damages sought by his pleading, that judgment was still final, since plaintiff had abandoned all its other claims. *Madison Chemical Corp.*, 52 Ill. App. 2d at 363-64, 202 N.E.2d at 125. In reaching its holding, the court explained:

> "The record, however, is clear that while plaintiff claimed interest, costs and damages in its original petition, plaintiff neither made a request for these claims at the time judgment was entered nor moved that the court reserve jurisdiction for that purpose. Moreover, the judgment order entered did not provide that the court retain jurisdiction for any further proceedings." *Madison Chemical Corp.*, 52 Ill. App. 2d at 362, 202 N.E.2d at 125.

For this reason, we find that the decision below did indeed terminate the litigation between the parties on the merits, and it is therefore a final and appealable order for purposes of Supreme Court Rule 303.

Thus we move on to the central issue of this case, namely, whether the trial court erred in finding that plaintiffs had acquired vested rights to R4 zoning for the North Kedzie Avenue property.

A legislative body has the right to amend its zoning ordinances (*Ropiy v. Hernandez*, 363 Ill. App. 3d 47, 51, 842 N.E.2d 747, 751 (2005)), and one who buys land is charged with the understanding that its zoning classification may be changed in the future within the limits of the law. *Furniture L.L.C. v. City of Chicago*, 353 Ill. App. 3d 433, 438, 818 N.E.2d 839, 844 (2004). Thus, the general rule is that property owners have no vested right in the continuation of

zoning classifications on their land. *Pioneer Trust & Savings Bank v. County of Cook*, 71 Ill. 2d 510, 517, 377 N.E.2d 21, 24 (1978); *Ropiy*, 363 Ill. App. 3d at 51, 842 N.E.2d at 751. However, courts have recognized an exception as follows:

> " '[W]here there has been a substantial change of position, expenditures or incurrence of obligations made in good faith by an innocent party under a building permit or in reliance upon the probability of its issuance, such party has a vested property right and he may complete the construction and use the premises for the purposes originally authorized, irrespective of subsequent zoning or a change in zoning classification.' " *Pioneer Trust*, 71 Ill. 2d at 522-23, 377 N.E.2d at 26, quoting *People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove*, 16 Ill. 2d 183, 191, 157 N.E.2d 33, 36 (1959).

See *Furniture*, 353 Ill. App. 3d 433, 818 N.E.2d 839 (applying the *Pioneer Trust* rule to hold that a property owner had acquired vested rights to develop its property in accordance with a previous zoning ordinance due to its expenditures in reliance on that zoning ordinance).

The purpose of this exception is to mitigate the unfairness caused to property owners who have made a substantial change in position in good-faith reliance on the probability of obtaining a building permit, only to have their efforts thwarted by a change in the zoning classification of their land. *1350 Lake Shore Associates v. Healey*, 223 Ill. 2d 607, 626, 861 N.E.2d 944, 956 (2006).

The trial court in this case found that plaintiffs fell within this exception, stating that their expenditures in pursuit of their building plans were substantial enough for them to obtain vested

No. 1-06-1671

rights to R4 zoning for the subject property. On appeal, the City raises three main arguments:

first, it contends that most of the findings relied upon by the trial court in its order are irrelevant

to the issue of vested rights; second, it contends that in this case, the purchase price of the

property should not count in determining substantiality; third, it contends that when the purchase

price is not taken into account, plaintiffs' expenditures were not substantial.

For zoning issues such as this one, we defer to the trial court's findings of fact unless they

are against the manifest weight of the evidence. *Pioneer Trust*, 71 Ill. 2d at 517, 377 N.E.2d at

24; see also *1350 Lake Shore Associates v. Hill*, 326 Ill. App. 3d 788, 794, 761 N.E.2d 760, 765

(2001) (applying an abuse of discretion standard to the trial court's factual findings in a

*mandamus* case). A finding is against the manifest weight of the evidence if it is unreasonable or

arbitrary, or an opposite conclusion is clearly evident. *Furniture*, 353 Ill. App. 3d at 437, 818

N.E.2d at 843. However, we apply a *de novo* standard of review to the trial court's resolution of

questions of law. See *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 236, 848 N.E.2d 1, 34 (2005).

In the case at hand, the City concedes in its brief that the trial court did not lack evidentiary

support for its factual findings; rather, it challenges the legal standards which the court applied to

these facts, advancing the arguments stated in the preceding paragraph.

The City's first major contention is that the trial court erred in considering factors

irrelevant to the issue of vested rights. In its order, the trial court made specific findings that (1)

plaintiffs purchased the Kedzie property "with the sole intention of developing under the then

existing zoning"; (2) plaintiffs would not have purchased it if they had suspected it would be

rezoned to R3; and (3) plaintiffs "never wavered in their intent and desire to develop the subject

-14-

property." The City does not contest the substance of these findings, but rather argues that they have no impact upon the vested rights analysis as developed in *Pioneer Trust* and the subsequent cases applying the *Pioneer Trust* standard. It contends that the vesting of zoning rights hinges upon what it classifies as an objective measurement – namely, the substantial expenditures and obligations incurred by landowners in good-faith reliance on a prior zoning classification – rather than subjective factors such as desire and intent of the landowners.[1]

It is true that subjective intent and desire to develop a property, without more, are insufficient to support a claim of vested rights to a zoning classification. *Goldblatt v. City of Chicago*, 30 Ill. App. 2d 211, 219, 174 N.E.2d 222, 226 (1961) (no finding of vested rights where landowner intended to build gas station on land but did not act in reliance on the probable issuance of a permit); see *Ropiy*, 363 Ill. App. 3d at 49, 55, 842 N.E.2d at 754 (rejecting landowner's claim of vested rights, despite uncontradicted evidence that he intended to construct a residential building on the subject property, because his expenditures were not made in good faith reliance on the previous classification). Substantial and objectively measurable expenditures in pursuit of that desire are necessary for a landowner's rights to become vested, and indeed, that is where the bulk of the analysis lies in prior cases dealing with this issue. *Pioneer Trust*, 71 Ill. 2d at 522-23, 377 N.E.2d at 26; see *Furniture*, 353 Ill. App. 3d at 441, 818 N.E.2d at 846.

---

[1] The City also raises contentions regarding the trial court's findings with respect to whether plaintiffs took action to develop the property within a reasonable amount of time. These contentions shall be discussed below.

However, the City is incorrect in its conclusion that subjective intent and desire are entirely irrelevant to the vested rights analysis. Although there is no bright-line test for what constitutes good-faith reliance (*Healey*, 223 Ill. 2d at 616, 861 N.E.2d at 950; *Furniture*, 353 Ill. App. 3d at 437, 818 N.E.2d at 843), a credibility determination regarding the purpose of the landowners is pertinent to the issue of good faith. *Furniture*, 353 Ill. App. 3d at 441, 818 N.E.2d at 846. For instance, in determining whether a landowner company had demonstrated justifiable reliance, the *Furniture* court found it relevant that the trial court made a credibility determination that the company's managers bought the land with the intention of developing it and never wavered from that intention. *Furniture*, 353 Ill. App. 3d at 441, 818 N.E.2d at 846. The *Furniture* court then proceeded to examine whether the expenditures by the landowner qualified as substantial under the *Pioneer Trust* standard. *Furniture*, 353 Ill. App. 3d at 442, 818 N.E.2d at 847. Thus, while the rights of a property owner to an existing classification do not vest solely on the basis of his intentions, such intentions by the property owner are nevertheless integral to any determination as to whether he has relied in good faith upon the preexisting zoning classification. Furthermore, the intent and desire of plaintiffs has direct bearing upon the issue of whether the purchase price of the land should be included in the substantiality calculation, as shall be developed below.

We therefore move to consider the issue of substantiality. As a threshold matter, we note that in measuring plaintiffs' good-faith expenditures in reliance on the existing R4 classification, we cannot count any expenditures incurred after October 1, 2003, the date when the city council proposal to change the zoning classification to R3 was published in the city council's journal of

proceedings. Past this point, plaintiffs had constructive knowledge of the proposed zoning

amendment, so we cannot say that they relied in good faith on a belief that the existing

classification would continue. See *Ropiy*, 363 Ill. App. 3d at 55, 842 N.E.2d at 754 (landowner

was charged with constructive knowledge of a proposed zoning change once the proposal was

published, and this knowledge was sufficient to defeat his vested rights claim based on

subsequent expenditures). Indeed, plaintiffs concede in their brief that only the expenditures

incurred before October 1, 2003, count toward substantiality.

The biggest expenditure that plaintiffs made prior to October 1, 2003, in pursuit of their

construction plans was the purchase of the property itself for $260,000. Accordingly, both

plaintiffs and the City focus heavily upon this expenditure in their arguments before this court:

the City contends that under the circumstances, the trial court erred in including the purchase

price of the Kedzie property in the substantiality determination. We disagree.

When determining whether expenditures are substantial, courts consider the totality of the

circumstances surrounding the planned development. *Healey*, 223 Ill. 2d at 627, 861 N.E.2d at

956. Relevant considerations include: the objective amount of expenditures; the balance

between the amount of expenditures and the total projected cost of development (known as

proportionality); and the nature of the person or entity seeking to develop the property. *Healey*,

223 Ill. 2d at 627, 861 N.E.2d at 956. None of these factors is dispositive by itself, nor is this an

exhaustive list of factors. Rather, substantiality must be determined through careful examination

of the unique features of each case. *Healey*, 223 Ill. 2d at 626, 861 N.E.2d at 956.

Absent special circumstances, the standard practice in Illinois vested rights decisions is

that the purchase price of the subject property is taken into account when determining whether

the property owners' expenditures were substantial. Thus, in *Healey*, 223 Ill. 2d at 627, 861

N.E.2d at 956, the Illinois Supreme Court states that the cost of the land is an appropriate

consideration in the substantiality calculus. The court in *Furniture*, 353 Ill. App. 3d at 442, 818

N.E.2d at 847, applied this principle as well. In *Furniture*, the plaintiff company purchased a site

with the intent of developing it for residential use. Plaintiff subsequently sold part of the land,

but it continued its plans for residential development of the remaining portion, hiring multiple

architectural firms to prepare designs for the project. Yet before plaintiff submitted its

application for a construction permit, the alderman proposed an ordinance to bar residential land

use from the area, which was later passed. In affirming the trial court's judgment that plaintiff

had acquired a vested right to the earlier zoning classification, the court of appeals stated that the

court below was correct in including the land's purchase price (incurred before the proposed

revision of the ordinance) in the substantiality determination. *Furniture*, 353 Ill. App. 3d at 442,

818 N.E.2d at 847. See also *American National Bank & Trust Company of Chicago v. City of

Chicago*, 19 Ill. App. 3d 30, 311 N.E.2d 325 (1974) (rejecting city's argument that the cost of the

land should not be included); *Sgro v. Howarth*, 54 Ill. App. 2d 1, 9, 203 N.E.2d 173, 177 (1964).

The City contends that the purchase price is not always automatically included in the

substantiality determination. Rather, it urges us to take the position that courts have latitude to

take the particular facts and circumstances of each case into account when deciding whether the

purchase price should count. In support, the City cites *O'Connell Home Builders, Inc. v. City of

Chicago*, 99 Ill. App. 3d 1054, 425 N.E.2d 1339 (1981), as a case where the court found that the

purchase price ought not be a factor. However, the facts of *O'Connell* are readily distinguishable from the case at hand. In *O'Connell*, plaintiffs entered into a contract to purchase certain real estate; the contract was made explicitly contingent upon plaintiffs' ability to obtain a permit to construct an apartment building on the property. *O'Connell*, 99 Ill. App. 3d at 1055, 425 N.E.2d at 1340. The zoning classification of the land was subsequently changed to prohibit such construction. In determining whether plaintiffs' rights to the preexisting zoning classification had vested, the court declined to consider the purchase price because of the contingent nature of the contract. *O'Connell*, 99 Ill. App. 3d at 1060, 425 N.E.2d at 1343. By contrast, in the present case, plaintiffs were not protected by any such safety valve; they had already purchased the Kedzie property, without the benefit of any contingency clause, when the legal rug was pulled out from under them by the change in zoning laws. As a result, even if we were to accept the City's argument that *O'Connell* properly stands for the proposition that courts can make a case-by-case determination of whether to account for purchase price, the *O'Connell* court's finding on that issue is not controlling.

The City advances two further arguments that the purchase price should not count under the circumstances of this particular case. First, the City contends that the property still retains most of its value under R3 zoning, as it may still be used for residential purposes; it urges us to adopt a rule whereby, if property is still usable for similar purposes to those originally permitted, then the purchase price should not be considered for the substantiality determination. However, the City fails to cite any Illinois law directly supporting this proposition. Such a rule would be out of line with the aforementioned Illinois cases where the purchase price is counted despite the

fact that the land may still be usable for other purposes even after the adverse zoning change. See *Healey*, 223 Ill. 2d at 627, 861 N.E.2d at 957 (listing the purchase price as a factor to take into account without regard to whether the land remained usable for other purposes).

Furthermore, while the City claims that this would be in line with the rule in other jurisdictions, the cases it cites for this proposition do not entirely support its point. The City first cites the Delaware case of *DiSabatino v. New Castle County*, 781 A.2d 698 (Del. 2000), for the general rule that land acquisition costs are not counted toward the substantial reliance calculation. However, the *DiSabatino* court recognizes an exception where the purchase price is directly related to the purchaser's intended use; because plaintiffs in that case bought the land for the sole purpose of building private residences, the court ruled that the purchase price weighed toward plaintiffs' substantial expenditures. *DiSabatino*, 781 A.2d at 704. The court further noted: "While [the land] may have inherent value as raw land, that value is of no significance to these plaintiffs, who have no alternative use for [these] lots." *DiSabatino*, 781 A.2d at 704. This analysis is directly pertinent to the case at hand: the trial court found that plaintiffs in the instant case bought the Kedzie property for the sole purpose of developing it in a certain fashion, and that purpose remained constant throughout their ownership of the land, even though the land may still have retained value for alternative uses under the R3 zoning. As this finding was supported by the testimony of Cribbin and Peter Koulogeorge at trial, we cannot say that it was against the manifest weight of the evidence. Thus, far from providing support for the City's position, *DiSabatino* weighs in favor of a finding that the purchase price ought to be accounted for. We agree with the *DiSabatino* court that when land is bought for a singular purpose, and that purpose

-20-

is entirely thwarted by a subsequent zoning change, the purchase price of the land should be taken into account in determining substantiality.

The City also cites the Oregon case of *Union Oil Co. of California v. Board of County Commissioners*, 81 Or. App. 1, 7, 724 P.2d 341, 344 (1986), in which the court states that land acquisition costs can never affect the substantiality determination in Oregon. The court gives two reasons for this determination. It first states that even after land use restrictions are imposed, land retains value for other purposes than those originally intended by the purchaser. *Union Oil*, 81 Or. App. at 7, 724 P.2d at 344. The *Union Oil* court additionally reasons that vested rights are geared toward those expenditures incurred in the "use" of the land, which can only transpire once the land is acquired, but that rights will not vest based upon expenditures incurred in its acquisition, since acquisition is not tantamount to use. *Union Oil*, 81 Or. App. at 7-8, 724 P.2d at 344. We decline to adopt the Oregon rule here, as it stands in direct opposition to the body of Illinois law cited above holding that the purchase price of the land is, indeed, an appropriate consideration. *Healey*, 223 Ill. 2d at 627, 861 N.E.2d at 957; *Furniture*, 353 Ill. App. 3d at 442, 818 N.E.2d at 847; *American National*, 19 Ill. App. 3d 30, 311 N.E.2d 325; *Sgro*, 54 Ill. App. 2d at 9, 203 N.E.2d at 177. Furthermore, we note that even the *Union Oil* court acknowledges that it is arguable that the purchase price of the land should be counted toward the substantiality determination to the extent that the landowner paid a "premium" directly related to the intended use. *Union Oil*, 81 Or. App. at 8, 724 P.2d at 344. In the case at hand, the trial court made a finding, supported by trial testimony, that plaintiffs bought the Kedzie property with the sole intention of building multiunit dwellings not possible under the revised zoning; thus, it can be

-21-

said that the entire purchase price constituted a premium toward their intended use of the land. See *DiSabatino*, 781 A.2d at 704 (using similar reasoning to conclude that the entire price of the land was a "premium" that should factor into the substantiality analysis).

The City further contends that the purchase price should not count because plaintiffs failed to develop the Kedzie property within a reasonable time after acquiring it. To acquire vested rights to a zoning classification under *Pioneer Trust* and its progeny, " 'the buyer must take action to develop the property within a reasonable time or else a city's right to amend its zoning ordinance in response to changing conditions would be greatly impaired.' " *Furniture*, 353 Ill. App. 3d at 438, 818 N.E.2d at 844, quoting *Wakeland v. City of Urbana, Illinois*, 333 Ill. App. 3d 1131, 1143, 776 N.E.2d 1194, 1205 (2002). The *Wakeland* court explains that one cannot buy land and let it sit unaltered for years, holding it for "inventory" or "investment purposes" without taking any steps toward development, and still be considered to be acting in good-faith reliance on an existing zoning classification. *Wakeland*, 333 Ill. App. 3d at 1142-43, 776 N.E.2d at 1205.

The City points out that plaintiffs were not actively developing the property from 1999 to 2003, and they urge us to adopt a bright-line rule that such a delay in development is unreasonable regardless of the circumstances that led plaintiffs to take such action. We disagree. As discussed above, the determination of whether expenditures are substantial is highly dependent on the individual facts and circumstances of each case. *Healey*, 223 Ill. 2d at 627, 861 N.E.2d at 957. To look at the passage of time in isolation, without regard to the reasons that may have contributed to the passage of such time, would be in direct contravention of that principle.

This is particularly true in light of the fact that the vested rights doctrine is an equitable doctrine designed to prevent unfairness to landowners. *Healey*, 223 Ill. 2d at 626, 861 N.E.2d at 957.

Moreover, the plaintiffs were not simply sitting on the Kedzie property without taking action, as in the scenario described by the *Wakeland* court. Testimony at trial indicated that plaintiffs fully intended to begin developing the Kedzie property within a few months of purchase, as was their standard custom with land they purchased for development, but the CBE essentially coerced them into leasing the land to it with its threat of condemnation. Furthermore, plaintiffs testified that even while the CBE was occupying their land, they proceeded to advance their development plans, meeting with an architect to draw up building designs in hopes that their plans would be complete by the time the lease ended. In light of this testimony, the trial court made a specific finding that plaintiffs "did everything in their power to salvage the development despite the Board's interference with their plans." This finding is not contrary to the manifest weight of the evidence. In point of fact, we note that, as we previously stated, the City has conceded that the trial court's factual findings were sufficiently supported by evidence. Therefore, we find that plaintiffs did not breach the *Wakeland* requirement of development within a reasonable timeframe, and the delay in developing the Kedzie property ought not be counted against them.

Thus, given our conclusion that the purchase price ought to count as part of the plaintiffs' expenditures in reliance under the previous zoning regime, the only issue left to be decided is whether those expenditures were substantial. Because substantiality is a necessarily fact-intensive determination, we cannot say that the court below went against the manifest weight of

the evidence in deciding this issue in favor of plaintiffs. See *In re Estate of Ferguson*, 313 Ill. App. 3d 931, 938, 730 N.E.2d 1205, 1211 (2000) (decision is not against the manifest weight of the evidence unless complainant can demonstrate "plain, clear, and undisputable error" in the court's findings). There was considerable evidence adduced at trial about the magnitude of expenses incurred by plaintiffs, including the $260,000 cost of the land itself, and Cribbin also offered testimony about the alternate business opportunities that plaintiffs chose to pass up because of their purchase of the Kedzie property in reliance on a favorable zoning regime. In light of the accumulated weight of this evidence, we are unable to say that the trial court's judgment was erroneous, particularly since much lesser expenditures have been considered substantial by Illinois decisions in the past. See, *e.g.*, *O'Connell*, 99 Ill. App. 3d at 1061, 425 N.E.2d at 1344 ($12,000 fee for architectural services plus $5,500 tree removal expense is substantial); *Sgro*, 54 Ill. App. 2d at 9, 203 N.E.2d at 177-78 ($21,000 property appraisal fee plus a purchase price of approximately $23,000 is substantial).

The City argues that when the purchase price of the property is discounted, it is plain that the trial court erred in finding plaintiffs' expenditures to be substantial; however, we need not reach this argument, as we have already found, for reasons stated earlier, that the purchase price of the Kedzie property is properly included in the expenditures that plaintiffs made in reliance on the previous zoning ordinance.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

No. 1-06-1671

McBRIDE, P.J.,[2] and O'MALLEY, J., concur.

| | **REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**<br>(Front Sheet to be Attached to Each Case) |
|---|---|
| Please use the following form | Anthony Cribbin, Peter Koulogeorge, and Donna Koulogeorge,<br><br>Plaintiffs-Appellees,<br><br>v.<br><br>The City of Chicago, Richard Rodriguez, Executive Director,<br>City of Chicago Department of Construction and Permits, and Unknown Others,<br><br>Defendants-Appellants. |
| Docket No.<br><br>COURT<br><br><br><br>Opinion Filed | No. <u>1-06-1671</u><br><br>Appellate Court of Illinois<br>First District, <u>SIXTH</u> Division<br><br>August 15, 2008<br>(Give month, day and year) |
| <br><br>JUSTICES | JUSTICE JOSEPH GORDON DELIVERED THE OPINION OF THE COURT:<br><br><u>    McBride, P.J., and O'Malley, J.    </u>, concur. |
| APPEAL from the Circuit Court of Cook County; the Hon___ Judge Presiding. | Lower Court and Trial Judge(s) in form indicated in margin:<br><br>Appeal from the Circuit Court of Cook County.<br><br>The Hon. <u>  Thomas P. Quinn  </u> Judge Presiding. |

---

[2] Justice McNulty initially heard the oral argument in this case. Following her retirement, however, Presiding Justice McBride took her place on the panel; she has listened to the tapes of the oral argument and read the briefs.

| | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented. |
|---|---|
| APPELLANTS: John Doe, of Chicago | APPELLANT: Mara S. Georges, Corporation Counsel of the City of Chicago, Benna Ruth Solomon, Deputy Corporation Counsel, Myriam Zreczny Kasper, Chief Assistant Corporation Counsel, and Nadine J. Wichern, Assistant Corporation Counsel, 30 North LaSalle Street, Suite 800, Chicago, Illinois 60602 |
| For APPELLEES, Smith and Smith of Chicago | APPELLEES: Thomas J. Ramsdell, Carl E. Meyers, Thomas J. Ramsdell & Associates, One East Wacker Drive, Suite 2020, Chicago, Illinois 60601 |
| Add attorneys for 3rd party appellants and/or appellees. | |